**STATE of Minnesota, Respondent,**

v.

**Jarvis Jermaine ATKINSON, Appellant.**

**No. A08–146.**

Supreme Court of Minnesota.

Nov. 5, 2009.

Lori Swanson, Attorney General, Susan Gaertner, Ramsey County Attorney, Thomas R. Ragatz, Assistant Ramsey County Attorney, St. Paul, MN, for respondent.

Davi E. Axelson, Assistant State Public Defender, St. Paul, MN, for appellant.

OPINION

PAGE, Justice.

On September 26, 2007, Jarvis Jermaine Atkinson was found guilty by a Ramsey County jury of two counts of first-degree murder, one count of second-degree murder, two counts of attempted first-degree murder, and one count of attempted second-degree murder for the shooting death of Gary Sligh and the wounding of Emmanuel Paye. The trial court convicted Atkinson of one count of first-degree murder for the death of Sligh and imposed the mandatory sentence of life in prison. For the wounding of Paye, the court convicted Atkinson of one count of attempted first-degree murder and imposed a consecutive 180–month sentence. In this direct appeal, Atkinson argues that the trial court abused its discretion when it: (1) denied his motion to present an alternative perpetrator defense; (2) excluded his proffered alternative perpetrator evidence; (3) admitted rap lyrics seized from him in jail; and (4) failed to strike prejudicial comments by the State's witnesses. We affirm.

The record reveals the following. On the night of January 19, 2007, Atkinson and his friend James Jordan went bowling at the Midway Pro Bowl with Atkinson's girlfriend Aneka Miller. Jordan and Atkinson left the bowling alley shortly after midnight and arrived at the Starting Gate Bar around 12:30 a.m. Atkinson was driving a champagne-colored Chevy Malibu that belonged to Miller.

Sheronda Whitaker, Chanyahl Conley, and Tiffany Garretson were at the Starting Gate that night. They had been drinking

at the Trend Bar but left the Trend when it closed at 1 a.m. and went to the Starting Gate because it was open until 2 a.m. Sligh and Paye were at the Starting Gate that night celebrating Sligh's recent promotion at work. They arrived at the Starting Gate around 1:30 a.m. and began playing pool with their friends Whitaker, Conley, and Garretson. Jordan, a friend of Conley's, also played pool with the group.

At about 1:47 a.m., Jordan received a phone call from Jennifer Guerrero, the mother of his two-year-old child. Guerrero had been drinking at the Foundry Pub and after talking with Jordan took a cab to the Starting Gate. Guerrero was quite intoxicated when she arrived at the Starting Gate and soon after arriving told Jordan she wanted to leave. Jordan asked Atkinson to drive Guerrero home, which he evidently agreed to do. Shortly after the bar closed at 2 a.m., Jordan, Guerrero, and Atkinson walked out to the car driven by Atkinson. Guerrero got into the front passenger seat and Jordan, after speaking briefly with Atkinson, went back into the bar. Shortly after Jordan walked Guerrero and Atkinson to the car, Whitaker, Conley, and Garretson left the Starting Gate and drove across West 7th Street to a convenience store.

According to Guerrero, Atkinson began driving out of the parking lot but stopped when a vehicle pulled up behind them. Atkinson said something like, "I'm going to show these niggas how we do it from the Chi," then got out of the car and walked toward the car behind them. Guerrero thought she heard "some shots" after Atkinson left the car, but did not see a gun in Atkinson's hands and did not see the shootings.

Paye testified that he and Sligh left the bar shortly after it closed. With Sligh driving, they pulled out of their parking spot and drove toward the parking lot's West 7th Street exit. They stopped when a car stopped in front of them, blocking their way. Paye testified that the person driving the car approached the driver's side of the car he was in and Sligh rolled down his window to see what the person wanted. The person pulled out a gun and said, "let me get your chain," apparently in reference to a chain with a large gold medallion being worn by Sligh. Sligh refused to give up the chain, and he and Paye attempted to leave the car through the passenger side door. The person then shot at them two to three times.

Sligh died at the scene after running a short distance from the car and falling on the West 7th Street roadway. Paye, although shot in the leg, was able to run toward a convenience store on the other side of West 7th Street. From there, he called 911 at 2:25 a.m. to report the shooting. About 30 to 45 seconds into the 911 call, Paye, referring to the car with the shooter, told the 911 operator that "they[ ] just pulled off."

In a call that began at 2:21 a.m. and ended at 2:25 a.m., Jordan phoned Conley from the Starting Gate's parking lot to ask for a ride with the three women. While the call was still in progress, the women left the convenience store and returned to the Starting Gate's parking lot to pick up Jordan. According to their testimony, none of the women saw the shooting of Sligh and Paye.

Police arrived within a few minutes of the 911 call. Paye was transported to Regions Hospital, where he was interviewed by the police. During that interview, Paye described the shooter as a 5′5″ or 5′6″ light-skinned African–American male, wearing a black or tan coat, and with a tattoo consisting of words on his neck. Parts of that description matched both Atkinson and Jordan. Atkinson is 5′6″, and Jordan is over 6′. Atkinson is light-

skinned, while Jordan has a darker complexion. Jordan has the words "Baby Jaylan" tattooed on the right side of his neck. Atkinson does not have any tattoos on his neck. In addition to describing the shooter, Paye also told police that there was a male passenger in the shooter's car and that the male passenger was the same man who he had played pool with that evening. Presumably, he was referring to Jordan. Later that day, Paye picked Atkinson out of a double-blind photo lineup as the shooter. Upon seeing Atkinson's photo during the lineup, Paye became very emotional.

The evening of January 20, 2007, Guerrero and Jordan saw a report about the shooting at the Starting Gate on television news. Guerrero told Jordan she thought Atkinson was involved, so they called the police.

Atkinson was arrested and during police questioning claimed that he spent the night of January 19, 2007, with his fiancée Jamie Brooks, at her home. But phone records indicate that Brooks placed unanswered calls to Atkinson's cell phone at 2:01 a.m., 2:02 a.m., 2:39 a.m., and 4:18 a.m. Atkinson did not testify at trial.

## I.

■■■ We first address Atkinson's claim that the trial court abused its discretion when it denied his motion to present alternative perpetrator evidence. Atkinson claims that the exclusion of his alternative perpetrator evidence denied him the right to present a complete defense. We review trial court rulings on evidentiary issues for an abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003). If we conclude that the trial court erred, we must then determine whether the error was harmless. *Id.* A conviction will stand if the constitutional error committed was harmless beyond a reasonable doubt. *State v. King*, 622 N.W.2d 800, 809 (Minn.

2001). The error is harmless if "the jury's verdict is 'surely unattributable' to [the error]." *Id.* at 811 (quoting *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997)).

■■■ A defendant has the constitutional right to present a complete defense. *State v. Jones*, 678 N.W.2d 1, 15–16 (Minn. 2004). The right to present a complete defense includes the right to present evidence showing that an alternative perpetrator committed the crime with which the defendant is charged. *State v. Blom*, 682 N.W.2d 578, 621 (Minn.2004). A defendant's right to present a complete defense is not absolute. *State v. Hannon*, 703 N.W.2d 498, 506 (Minn.2005). Courts may limit the scope of a defendant's arguments to ensure that the defendant does not confuse the jury with misleading inferences. *State v. Davidson*, 351 N.W.2d 8, 13 (Minn. 1984). Nonetheless, a defendant has the right to make all legitimate arguments on the evidence, to explain the evidence, and to "present all proper inferences to be drawn therefrom." *State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn.1980).

At a pretrial hearing, Atkinson moved the trial court for permission to argue that Jordan was an alternative perpetrator and to present evidence of Jordan's motive to kill and violent tendencies. The proffered evidence included photographs that are alleged to have been taken from Jordan's MySpace web page that shows Jordan wearing flashy jewelry, evidence of Jordan's felony conviction for terroristic threats, and evidence of Jordan's repeated violations of a no-contact order issued pursuant to that conviction. In support of the motion, Atkinson made an offer of proof that placed Jordan at the scene of the crime through the following facts: (1) Jordan called Conley to pick him up at the Starting Gate at 2:21 a.m.; (2) Paye called 911 at 2:25 a.m.; (3) one minute into Paye's phone call, he yelled "they just

pulled away," and (4) Jordan was picked up in the parking lot where the shootings took place. Atkinson's counsel argued that because this evidence places Jordan at the crime scene at the time of the shooting and because Paye's initial description of the shooter included a tattoo that matched Jordan's tattoo, the evidence has an inherent tendency to connect Jordan with the shootings.

In response, the State argued that this evidence did not have an inherent tendency to connect Jordan to the shootings. Specifically, the State argued that, while there was no evidence linking Jordan to the murder, there was ample evidence supporting Atkinson's guilt, including: (1) Paye's identification of Atkinson as the shooter; (2) Paye's statement that Jordan was not the shooter; (3) Guerrero's testimony; (4) the lack of physical evidence linking Jordan to the shootings; and (5) Jordan's behavior after the incident, namely, his voluntary interview with the police. In addition to arguing that the evidence relied on by Atkinson did not have an inherent tendency to connect Jordan to the shootings, the State argued that the evidence relating to Jordan's motive and violent tendencies was overly prejudicial and not relevant. The State also filed its own motion seeking, among other things, that the court prohibit defense counsel "from suggesting, stating, or implying that Jordan committed the crimes during the defense's voir dire, opening statement, cross examination, direct examination, and summation."

The trial court denied Atkinson's alternative perpetrator motion, stating:

I'm going to deny that motion of the defense to present the evidence of the alternative perpetrator and to offer the photographs of Mr. Jordan from the MySpace, or YouTube website, wherever they came from. There is little other

than the fact of being present that would have an inherent tendency to link [Jordan] to the commission of the crime. It appears that the court did not rule on the State's motion.

Determining whether alternative perpetrator evidence was improperly excluded at trial involves a two-step analysis. *Huff v. State*, 698 N.W.2d 430, 436 (Minn. 2005). First, we must determine whether the defendant laid a proper foundation for admission of such evidence by offering evidence that has an inherent tendency to connect the alternative perpetrator to the commission of the charged crime. *Id.* (citing *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn.1977)). The requirement that a proper foundation be laid is intended to "avoid[ ] the use of bare suspicion and safeguard[ ] the third person from indiscriminate use of past differences with the deceased." *Hawkins*, 260 N.W.2d at 159. If the defendant fails to lay a proper foundation, the alternative perpetrator defense will not be permitted. *Id.* If the defendant lays a proper foundation, he may then introduce "evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts" tending to prove the third party committed the crime. *Id.* The reason for allowing alternative perpetrator evidence is not for the purpose of establishing the alternative perpetrator's guilt, but to create a reasonable doubt as to the defendant's guilt. *Id.* at 158–59.

Mere presence at the scene of the crime does not, by itself, create an inherent tendency to connect a person alleged to be the alternative perpetrator to the commission of the charged crime. *State v. Flores*, 595 N.W.2d 860, 868–69 (Minn. 1999). In *Flores*, we considered whether a proper foundation had been laid when the only evidence connecting the alleged alternative perpetrator to the victim's murder

placed the alternative perpetrator at the scene of the murder sometime during the day on which the murder was committed. *Id.* at 869. We concluded that the alternative perpetrator's presence at the murder scene on the day of the murder, standing alone, was insufficient foundation for the introduction of alternative perpetrator evidence. *Id.* We noted that the alternative perpetrator had a strong alibi during the time when the crime was committed and that expert testimony about the nature of the crime tended to exonerate the alleged alternative perpetrator. *Id.*

In contrast, in *Hawkins*, we held that the evidence offered as foundation for the introduction of alternative perpetrator evidence did have an inherent tendency to connect the alternative perpetrator to the commission of the charged crime and that it was error to have excluded the alternative perpetrator defense. 260 N.W.2d at 160. In *Hawkins*, the alleged alternative perpetrator testified that he witnessed the shooting and was present when Hawkins attempted to hide the murder weapon by giving it to a third party. *Id.* at 155. Hawkins countered that the alternative perpetrator had actually committed the murder and therefore had a motive to convict the defendant to save himself. *Id.* at 157. On that basis, Hawkins sought to introduce, in support of his claim, evidence of the alternative perpetrator's reputation for violence and past illegal conduct. *Id.* at 157–58. We concluded that the alternative perpetrator's testimony about witnessing the shooting and Hawkins' attempts to dispense of the murder weapon constituted sufficient foundation for the introduction of alternative perpetrator evidence. *Id.* at 160.

While it is a close question, our careful review of the evidence Atkinson relies on as foundation for his alternative perpetrator defense leads us to conclude that the trial court did not abuse its discretion when it precluded Atkinson's alternative perpetrator defense. As previously noted, Atkinson relies on the following facts to connect Jordan to the shootings of Sligh and Paye: (1) Jordan's call to Conley to pick him up at the Starting Gate, which lasted from 2:21 a.m. to 2:25 a.m.; (2) Paye's call to 911 at 2:25 a.m., one minute into which Paye yelled "they just pulled away;" (3) Jordan being picked up in the parking lot where the shootings took place; and (4) Paye's initial description of the shooter having a tattoo that matches Jordan's tattoo. Essentially, Atkinson argues that Jordan's presence at the scene, along with Paye's initial description of the shooter's tattoo, was evidence having an inherent tendency to connect Jordan to the shootings of Sligh and Paye.

But the evidence relating to Jordan's phone call to Conley and the location where he was picked up, while placing Jordan at the place where the shooting occurred close to the time of the shootings does not, without more, connect Jordan to the commission of the crime. The evidence relating to Paye's 911 call does not connect Jordan to the location, to those who "just pulled away," or to the commission of the offense. Thus, this evidence does not, by itself, have an inherent tendency to connect Jordan to the offense.

The remaining foundation evidence relied on by Atkinson is the initial identification of the shooter that Paye gave to the police. On its face, Paye's initial identification of the shooter as having a tattoo similar to Jordan's tattoo, standing alone, appears to connect Jordan to the commission of the crime. That initial description does not, however, stand alone and cannot be considered in isolation. In fact, Paye consistently stated that Jordan was not the shooter. During the initial interview in which Paye provided the description of the

shooter, Paye told police that the man with whom he had played pool that evening (Jordan) was a passenger in the shooter's car. Further, at the time Paye identified the shooter as having a tattoo similar to Jordan's tattoo, Paye also identified the shooter as being a light-skinned African–American male who was approximately 5′5″ or 5′6″ tall. While those features are consistent with Atkinson's description, they do not fit Jordan, who has a darker complexion and is over 6 feet tall. More importantly, within hours of giving the police the initial description of the shooter, Paye positively identified Atkinson as the shooter after viewing a double-blind photo lineup. Paye has not wavered in his identification of Atkinson as the shooter since that time. Further, identifying Jordan as a passenger in the shooter's car is obviously inconsistent with identifying Jordan as the shooter, and this inconsistency along with Paye's other statements identifying the shooter undermines Paye's statement about the shooter having a tattoo that Atkinson relies on to connect Jordan to the shootings.

Given the record before us, we agree with the trial court that "there is little other than the fact of being present that would have an inherent tendency to link [Jordan] to the commission of the crime." Thus, Atkinson failed to lay a sufficient foundation for the introduction of his proffered alternative perpetrator defense, and the trial court properly denied his motion. On that basis, we hold that the trial court

did not abuse its discretion when it precluded Atkinson from using the alternative perpetrator defense. Therefore, Atkinson is not entitled to any relief on his alternative perpetrator claim.[1] Because we conclude Atkinson did not lay sufficient foundation for the introduction of his proffered alternative perpetrator evidence, we are not required to consider whether that evidence was otherwise admissible. *See State v. Gutierrez,* 667 N.W.2d 426, 436 (Minn. 2003).

 Even if Atkinson had laid a proper foundation, the trial court's exclusion of the images showing Jordan wearing flashy jewelry taken from Jordan's MySpace web page and the evidence related to Jordan's felony conviction and violations of the no-contact order was not error. In order to be admissible, the evidence must be more probative than prejudicial. Minn. R. Evid. 403. A defendant may introduce evidence showing that "crimes of a similar nature have been committed [by the third person] when the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed the [charged offense]." *Gutierrez,* 667 N.W.2d at 437 (citations omitted) (internal quotation marks omitted). A defendant may introduce such evidence of a third party's bad acts, normally known as "reverse-*Spreigl*" evidence, only if the defendant has established: "(1) by

---

1. Although Atkinson was precluded from using the alternative perpetrator defense, he had the opportunity and did, through his cross-examination of prosecution witnesses, insinuate that Jordan shot Sligh and Paye so as to cast doubt that Atkinson was the shooter. For example, during cross-examination Atkinson's attorney extensively questioned Paye about his identification of the shooter as having a tattoo. Moreover, during its closing argument, the State discussed the possibility

that the defense might suggest Jordan as an alternative perpetrator during the defense's closing argument. While this opened the door for Atkinson to argue that Jordan was the actual shooter, he did not do so, instead making the point to the jury that his efforts were focused on creating reasonable doubt. Thus, the jury had ample opportunity to consider the possibility that Jordan or someone else was the shooter.

clear and convincing evidence that the third party participated in the reverse-*Spreigl* evidence; (2) that the reverse-*Spreigl* incident is relevant and material to [the] defendant's case; and (3) that the probative value of the reverse-*Spreigl* evidence outweighs its potential for unfair prejudice." *Id.* (citation omitted) (internal quotation marks omitted).

Here, Atkinson sought to admit photo images from Jordan's MySpace web page to show Jordan's motive for robbing Sligh and the shooting of Sligh and Paye. According to Atkinson, Jordan's affinity for flashy jewelry was the motive for Jordan to attempt to rob Sligh. When Sligh refused to turn over his jewelry during the robbery, Atkinson contends that Jordan's volatile temper caused him to shoot Sligh and Paye. But the photo images of Jordan wearing jewelry, standing alone, are of limited probative value with respect to Jordan's motive to rob Sligh. The defense made no showing that having an affinity for flashy jewelry correlates to an increased likelihood that one will commit a crime to obtain such jewelry. Further, the potential prejudice of these images was significant, as they are inflammatory and had the potential to mislead and confuse the jury. Consequently, we conclude that the images from Jordan's MySpace web page were inadmissible and properly excluded.

■ We also conclude that the reverse-*Spreigl* evidence Atkinson sought to introduce was inadmissible. Atkinson sought to present evidence of Jordan's terroristic threats conviction to show Jordan's propensity for violence. In addition, he sought to introduce police interviews with Guerrero describing the threats and acts of violence that led to Jordan's conviction, including: (1) threats to "shoot up her house and kick the [s* * *] out of her;" (2) an account of Jordan deliberately driving his Ford Exhibition SUV into Guerrero's Ford Focus while their 6–month–old daughter was in the car with Guerrero; and (3) Guerrero's statement that she "feared for the safety of [her] baby" during the incident in the car. Finally, Atkinson sought to introduce evidence that Jordan repeatedly violated the no-contact order issued by the court as part of the sentence for his terroristic threats conviction, to show that Jordan flagrantly ignores court orders.

The reverse-*Spreigl* incidents offered by Atkinson bear no similarity to the charged crimes in this case. Consequently, the incidents have no probative value because they fail to meet the standard for admission of alternative perpetrator reverse-*Spreigl* evidence we articulated in *Gutierrez*, as they are not "so closely connected in point of time and method of operation" to the charged crime as to cast doubt upon the identification of Atkinson as the person who shot Sligh and Paye. *See Gutierrez*, 667 N.W.2d at 437. The reverse-*Spreigl* incidents centered on a terroristic threat that Jordan made against his girlfriend, using his vehicle to run her off the road, and violations of a no-contact order. The charged crimes involve an attempted armed robbery and the subsequent shooting of two strangers in a parking lot of a bar. Given the dissimilarity between the reverse-*Spreigl* incidents and the charged crimes, we hold that the exclusion of the reverse-*Spreigl* evidence was not error.

## II.

■ At trial, the State was allowed to enter into evidence rap lyrics that had been handwritten by Atkinson and that had been seized from his belongings while he was being held pending trial. The lyrics were labeled "An Official Jip Diss" and contained profanity and various lyrics that could be viewed as threats of violence

against "snitches." The lyrics also contained indirect references to Jordan and Guerrero, threats of violence against both of them, and insinuations that Jordan is a "snitch" deserving of violent punishment for his testimony. Atkinson contends that the trial court erred by admitting these lyrics because they were irrelevant and their probative value was outweighed by their prejudice to Atkinson. With respect to the threats contained in the lyrics, Atkinson further argues that the lyrics were not relevant because the lyrics, which could be viewed as threats, were his personal belongings and were never communicated or intended to be communicated to either Jordan or Guerrero or anyone else and therefore do not show consciousness of guilt. Thus, he argues that the lyrics contain no legitimate or specific threats and were inadmissible. The State argues that the court did not abuse its discretion in admitting the lyrics because the lyrics clearly reference Jordan and Guerrero and constitute threats made against a witness in the case. The State contends that the threats found in the lyrics are relevant because they show Atkinson's consciousness of guilt and that the lyrics' probative value outweighs any prejudice to Atkinson.

■■■■ A trial court's evidentiary rulings will be reversed only if an appellant can show that the court abused its discretion and that the defendant was prejudiced by the error. *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003). When evaluating whether an error in admitting evidence was prejudicial, we look to whether the wrongfully admitted evidence affected the verdict. *State v. Post*, 512 N.W.2d 99, 102 n. 2 (Minn.1994). If there is a reasonable possibility that the verdict might have been more favorable to the defendant without the evidence, the error is prejudicial. *Id.* Threats made by a defendant against a witness may be relevant to show

consciousness of guilt. *State v. Mayhorn*, 720 N.W.2d 776, 783 (Minn.2006) (citing *State v. Harris*, 521 N.W.2d 348, 353 (Minn.1994)).

Here, while Atkinson argues that the rap lyrics were not communicated to any trial witnesses and do not contain legitimate or specific threats, the lyrics do contain language that could be construed as threatening both Jordan and Guerrero. We have not previously addressed whether threats made against, but not communicated or intended to be communicated to, a witness show consciousness of guilt. In our view, the fact that the threat was not communicated or intended to be communicated, however, does not by itself mean that the maker of the threat is any less conscious of guilt than one who intends to communicate the threat or otherwise take some action on the threat. Consciousness of guilt is a state of mind. The lyrics here, while indirectly, clearly refer to Jordan and Guerrero, equate them with being snitches, and note that bad things happen to snitches. Therefore, we conclude that the lyrics do show consciousness of guilt and are sufficiently relevant to be admissible.

Alternatively, Atkinson argues that even if these lyrics were relevant as showing consciousness of guilt, the trial court erred in admitting them because their probative value is outweighed by their prejudicial effect, noting that the lyrics contain numerous violent images, references to gangs, and profanity, all of which cast him in a negative light. We have recognized the substantial danger of unfair prejudice that can result from evidence of threats against witnesses and that safeguards are required to ensure a jury does not rely too heavily on threat evidence. *See State v. Clifton*, 701 N.W.2d 793, 797 (Minn.2005) (observing that evidence of third-party threats against witnesses could be ex-

tremely prejudicial if viewed as coming from defendant). We have also recognized the potential for unfair prejudice from evidence having the potential to influence the jury's passions against the defendant. *See, e.g., State v. Schulz,* 691 N.W.2d 474, 478–79 (Minn.2005) (stating that probative evidence that arouses the passions of the jury will be admitted unless the tendency of the evidence to persuade by "illegitimate means" exceeds its probative value). While it is a close question, in the end we conclude that the probative value of the lyrics outweighed their potential for unfair prejudice, and therefore hold that the trial court did not abuse its discretion by admitting them.

### III.

██ Atkinson next argues that prosecution witnesses' references to his incarceration, prior arrests, and use of a public defender were improper and the trial court erred in failing to issue a curative instruction or order a mistrial. On direct examination, the corrections officer who discovered the "An Official Jip Diss" lyrics, in laying the foundation for the introduction of those lyrics, referred to Atkinson's incarceration in the county jail while testifying. Defense counsel objected and requested a curative instruction, but the trial court denied the request. During cross-examination, prosecution witness Patrick Scanlon, the owner of the Starting Gate bar, mentioned that a defense investigator who came to the bar worked for the "Public Defender's Office." Again, defense counsel objected and this time requested a mistrial, which was denied. And during cross-examination, prosecution witness Sgt. Janet Dunnom testified that she had discovered Atkinson's last name by searching "the Ramsey County system that contains information on persons arrested and booked in that county." No objection was made to this mention of Atkinson having been previously arrested.

Atkinson contends that these references, individually and collectively, resulted in prejudicial error. He argues that: (1) the reference to his incarceration was deliberate and was intentionally emphasized through Officer Reynolds testimony; (2) the reference to the public defender's office was prejudicial because the jury might impugn his character based on his economic status and the resulting taxpayer burden; (3) the reference to his previous arrests constituted plain error, which affected his substantial rights; and (4) even if these errors viewed individually are harmless, when viewed collectively, they were not harmless. We disagree.

██ We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Spann,* 574 N.W.2d 47, 53 (Minn. 1998). We have said that it is not necessarily "prejudicial for the jury to learn that a defendant is in jail for the crime for which he or she is on trial." *State v. Manthey,* 711 N.W.2d 498, 506 (Minn. 2006). In *Manthey,* we observed that "jurors' knowledge that a defendant is in custody pending the outcome of a first-degree murder trial is 'likely to [have been] seen for just what it is—standard law enforcement practice,'" and thus did not significantly prejudice the defendant. *Id.* at 506–07 (quoting *State v. Shoen,* 598 N.W.2d 370, 378 (Minn.1999)). Here, as in *Manthey,* any reference to Atkinson's incarceration was minimally prejudicial because most jurors would expect that Atkinson would be in custody during trial. Moreover, the reference to Atkinson's incarceration was relevant and necessary as foundation for the introduction of the "An Official Jip Diss" lyrics. *See State v. Jobe,* 486 N.W.2d 407, 414–15 (Minn.1992) (concluding that otherwise inadmissible reference to defendant's *Miranda* warning was

**596**

admissible as foundation for admission of defendant's statement of guilt). Thus, we hold that because the references to Atkinson's incarceration were necessary as foundation for the admission of the lyrics, the references were admissible and the denial of the request for a curative instruction was not error.

As for the public defender reference, the witness's offhand remark that an investigator gathering evidence related to the case worked for the "Public Defender's Office" was indirect and fleeting, and any prejudice attributable to the comment was insignificant. We conclude that the trial court did not abuse its discretion when it declined to declare a mistrial.

■■■■■ Finally, because defense counsel did not object to the indirect reference to Atkinson's previous arrests, the court's failure to issue a curative or limiting instruction is reviewed under the plain error rule. *See* Minn. R.Crim. P. 31.02; *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). Under the plain error rule, a defendant must show (1) there is error; (2) that is plain; and (3) the error affected substantial rights. *State v. Strommen,* 648 N.W.2d 681, 686 (Minn.2002). "If those three prongs are met, we may correct the error only if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn. 2001)).

As with the references to Atkinson's use of a public defender, the references to Atkinson's previous arrests were fleeting, nonspecific, and minimally prejudicial, if at all. Consequently, the admission of this testimony did not affect Atkinson's substantial rights, and he is not entitled to any relief on this claim.

Because the references to Atkinson's use of a public defender, his incarceration at the time of trial, and his prior arrests were fleeting, nonspecific, and minimally prejudicial when viewed individually, and because the reference to Atkinson's prior arrests did not affect his substantial rights, we conclude that even when viewed collectively, these references did not unfairly prejudice Atkinson. Thus, we hold that the trial court did not err in admitting these references or in failing to issue a curative instruction with respect to the references.

Affirmed.