*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1466**

State of Minnesota,
Respondent,

vs.

Tommy Ray Morgan, Sr.,
Appellant.

**Filed August 15, 2016
Affirmed
Rodenberg, Judge**

St. Louis County District Court
File No. 69DU-CR-14-1710

Lori Swanson, Attorney General, Edwin W. Stockmeyer, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Charles F. Clippert, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Rodenberg, Presiding Judge; Peterson, Judge; and Bjorkman, Judge.

**U N P U B L I S H E D   O P I N I O N**

**RODENBERG**, Judge

On appeal from his multiple convictions arising from a home invasion, appellant Tommy Ray Morgan, Sr., argues that the district court improperly determined that alternative-perpetrator evidence was inadmissible, and that it erroneously denied his

request for a special jury instruction concerning the reliability of eyewitness-identification testimony. We affirm.

## FACTS

At around 11:00 p.m. on May 17, 2014, a male intruder broke the side door of J.A.M.'s house, entered, and appeared in her bedroom doorway. The intruder was wearing a black hooded sweatshirt, black pants, a nylon stocking over his face, and white latex gloves. He demanded that J.A.M. give him jewelry and money. J.A.M. told the intruder where one of her purses was located, and she gave him a jewelry box and her cell phone. The intruder stole two purses, the jewelry box and contents, and the cell phone.

As the intruder was leaving, he threw a vase at J.A.M., striking her in the face. The intruder had J.A.M.'s cell phone, and she did not have a land telephone line, so she went to her neighbor's house to call 911. An ambulance took J.A.M. to the hospital. J.A.M. suffered numerous cuts and fractures to her face, internal bleeding on her brain, and damage to her right tear duct. She underwent numerous procedures to address her injuries.

Sometime after the robbery, appellant knocked on the door of his cousin's home and offered to sell her some jewelry.[1] Appellant's cousin, T.D., declined appellant's

---

[1] The testimony at trial and record evidence is inconsistent concerning the exact timeline of events, including the precise date of appellant's jewelry-sale offer. Appellant does not argue, however, that the evidence is insufficient to support his convictions. And the precise dates of T.D.'s involvement are unnecessary to support the jury's verdicts. We view the facts concerning T.D.'s involvement in the light most favorable to the jury's verdicts. *See State v. Fox*, 868 N.W.2d 206, 223 (Minn. 2015) (viewing the facts in the light most favorable to the jury's verdict in a challenge to the sufficiency of the evidence).

2

offer. As appellant was leaving, however, he dropped a gold ring with a diamond. On May 19, T.D. took that ring to Duluth Police Officer Michael Erickson and told him about appellant having offered to sell her some jewelry. Officer Erickson brought the ring to J.A.M, who immediately identified it as her mother's wedding ring.

On May 20, 2014, J.A.M. told Duluth Police Sergeant Matthew McShane that there had been fraudulent transactions on credit and debit cards that were stolen during the home invasion. Sergeant McShane obtained security footage from a convenience store and a bank automated teller machine (ATM) where the fraudulent transactions took place. Upon reviewing the footage from the convenience store, Sergeant McShane learned that C.J., later determined to be another cousin of appellant, used J.A.M's credit card to make a purchase. Footage from the ATM showed a male with a tattoo on his neck. The man thrice attempted to use J.A.M.'s debit card to withdraw money from her bank account. All three withdrawal requests, for $4,000, $400, and $160, were declined.

Also on May 20, 2014, police officers executed a search warrant at C.J.'s residence, where appellant was also residing. The officers found J.A.M.'s property, including her credit cards, purses, jewelry, and cell phone. Some of J.A.M.'s credit cards and paperwork were found near appellant's medical paperwork. Another man, E.B., was using J.A.M.'s cell phone when the officers arrived. The officers found other evidence in the home, including two white, latex gloves that contained only E.B.'s DNA and an ATM receipt indicating that an incorrect personal ID had been entered.

On May 21, 2014, Investigator David Decker of the Duluth Police Department interviewed appellant's sister, K.M., who said that she and appellant were staying at

3

C.J.'s home on the night of May 17. K.M. told Investigator Decker that appellant was in and out of the apartment throughout the evening, but returned shortly after midnight with several purses, credits cards, jewelry, and a driver's license of "an older white woman with blonde hair wearing a green shirt." This description matched J.A.M.'s physical appearance. Appellant told K.M. that he got the items by kicking in a door.

On May 22, 2014, Investigator Decker interviewed C.J., who was not home during the search of her residence. C.J. said appellant returned to her apartment in the early morning hours of May 18 with the stolen items. Appellant told C.J. that "this is how I'm going to pay you back." C.J. recalled that the first names on the cards matched the names of J.A.M. and J.A.M.'s husband. She also said that appellant returned alone and was wearing a black hooded sweatshirt. C.J. said that appellant broke into a house on the street where J.A.M. lived to get the items.

Also on May 22, 2014, appellant made a statement to Sergeant McShane. Appellant said that he was in Superior, Wisconsin, during the home invasion and the entire weekend after that. When officers interviewed appellant, they searched him and found a package containing 0.084 grams of heroin in his front pocket.

The parties stipulated that appellant was wearing a required GPS ankle monitor during a period of time that included May 17, 2016. Critically, the ankle-monitor records indicate that appellant was at J.A.M.'s house at the time of the home invasion and at the ATM at the time of the unsuccessful attempts to withdraw money from J.A.M.'s account.

The state charged appellant with two counts of first-degree assault in violation of Minn. Stat. § 609.221, subd. 1 (2012), two counts of first-degree aggravated robbery in

4

violation of Minn. Stat. § 609.245, subd. 1 (2012), one count of first-degree burglary in violation of Minn. Stat. § 609.582, subd. 1 (2012), three counts of financial transaction card fraud in violation of Minn. Stat. § 609.821, subd. 2 (2012), and one count of fifth-degree possession of a controlled substance in violation of Minn. Stat. § 152. 025, subd. 2 (2012). Appellant moved to admit alternative-perpetrator evidence of an admission by E.B. that he had kicked in doors to houses and burglarized places, and moved the district court to give a special jury instruction concerning eyewitness identification. The district court denied both motions. A jury found appellant guilty of all counts, and the district court sentenced appellant to four concurrent sentences of 132 months, 129 months, 160 months, and 28 months. This appeal followed.

## D E C I S I O N

### I.    Alternative-Perpetrator Evidence

Appellant first argues that the district court erred in denying his request to offer evidence that an alternative perpetrator committed the assault, aggravated-robbery, and burglary offenses. We review a district court's decision to exclude alternative-perpetrator evidence for abuse of discretion. *State v. Sailee*, 792 N.W.2d 90, 93 (Minn. App. 2010) *review denied* (Minn. Mar. 15, 2011). "If we determine that the [district] court erred, the conviction will still stand if the error was harmless beyond a reasonable doubt." *Id.* "The error is harmless if the jury's verdict is surely unattributable to the error." *Id.* (quotation omitted).

A criminal defendant has a due-process right under the United States and Minnesota Constitutions to be treated fairly and to present a complete defense. *State v.*

5

*Richards*, 495 N.W.2d 187, 191 (Minn. 1992) (citing *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984)); s*ee* U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7.   This includes the right "to present evidence showing that an alternative perpetrator committed the crime with which the defendant is charged."   *Sailee*, 792 N.W.2d at 93 (quotation omitted).  "Alternative perpetrator evidence is admissible only if the defendant makes a threshold showing that the evidence the defendant seeks to admit has an inherent tendency to connect the alternative perpetrator to the commission of the charged crime."   *State v. Ferguson*, 804 N.W.2d 586, 591 (Minn. 2011) (quotations omitted).  This connection must be established beyond a "bare suspicion."  *State v. Blom*, 682 N.W.2d 578, 621 (Minn. 2004).  If such a showing is made, the defendant may then introduce evidence of a motive or other facts that tend to prove a third party committed the crime.  *State v. Atkinson*, 774 N.W.2d 584, 590 (Minn. 2009).

On appeal, appellant argues that the district court erred in concluding that the proffered alternative-perpetrator evidence did not have an inherent tendency to connect E.B.[2] with the assault, aggravated-robbery, and burglary offenses.  *See Ferguson*, 804 N.W.2d at 591.  Except for E.B.'s statement to police that E.B. no longer goes around kicking in doors to houses and burglarizing places, all of appellant's proffered

---

[2] In pretrial hearings, appellant also identified C.J. as a possible alternative perpetrator. The district court concluded that the evidence did not have an inherent tendency to connect C.J. to the offenses.  Appellant does not argue on appeal that this was error. Therefore, we do not consider whether evidence that C.J. was a possible alternative perpetrator was properly excluded.  *See State v. Butcher*, 563 N.W.2d 776, 780 (Minn. App. 1997) (explaining that issues not briefed on appeal are waived), *review denied* (Minn. Aug. 5, 1997).  We only address appellant's alternative-perpetrator argument concerning E.B.

alternative-perpetrator evidence was ultimately presented to the jury. In reaching this conclusion, the district court considered as foundational evidence that only E.B.'s DNA was found on the white latex gloves found in C.J.'s home, that E.B. was using J.A.M.'s stolen phone when police searched C.J.'s home, and that E.B. had a piece of J.A.M.'s cut-up driver's license in his pocket. The district court's ruling therefore effectively excluded E.B.'s statement and prohibited appellant from presenting an alternative-perpetrator defense in connection with the other proffered alternative-perpetrator evidence.

In *Ferguson*, the Minnesota Supreme Court concluded that "the alternative perpetrator foundational evidence . . . was sufficient to allow Ferguson to present an alternative perpetrator defense." 804 N.W.2d at 592. To satisfy the inherent-tendency requirement in that case, Ferguson offered the following evidence: (1) that someone told police that a man by the name of C.J. shot the victim; (2) that the alternative perpetrator's initials were C.J.; (3) that the alternative perpetrator was listed as C.J. in the victim's cell-phone contacts; (4) that the alternative perpetrator had a tattoo of the letters C.J. on his arm; (5) that the alternative perpetrator spoke to the victim on the phone three days before the shooting; (6) that the alternative perpetrator's physical description was similar to witnesses' descriptions of the shooter; (7) that the alternative perpetrator had a car matching some of the descriptions of the car seen at the crime scene; and (8) that the alternative perpetrator was arrested for unlawful possession of a firearm approximately five months before the shooting, but was not in custody at the time of the shooting. *Id.* at 591.

In reaching its conclusion in *Ferguson*, the supreme court distinguished *Atkinson*, "in which [it] noted that evidence of an alternative perpetrator's presence at the scene of the crime is insufficient on its own to create an inherent tendency connecting the alternative perpetrator to the crime." *Id.* at 592 (citing *Atkinson*, 774 N.W.2d at 590). In *Atkinson*, the defendant sought to satisfy the inherent-tendency requirement with evidence that the alternative perpetrator was at the scene of the crime and had a tattoo similar to the shooter's tattoo. 774 N.W.2d at 591. The supreme court considered *Atkinson* a "close question," but ultimately factored in the victim's identification of the defendant as the shooter to conclude that, taken together, the defendant's evidence did not satisfy the inherent-tendency requirement. *Id.* at 591-92.

Here, the facts that E.B. was using J.A.M.'s cell phone and had a piece of her cut-up driver's license in his pocket does not have an inherent tendency to connect him to the commission of the offenses. Testimony established that appellant brought the stolen items back to C.J.'s home and that multiple people were present in C.J.'s home after the offenses and handled the stolen property. The facts do not inherently tend to put E.B. in J.A.M.'s home. *See Ferguson*, 804 N.W.2d at 592 (relying on evidence indicating alternative perpetrator was at the scene of the crime to support conclusion that alternative-perpetrator defense was appropriate); *but see Atkinson*, 774 N.W.2d at 590-92 (concluding that, without more, evidence that alternative perpetrator was at the location where the crime took place was insufficient to link alternative perpetrator to the commission of the crime).

Appellant also argues that E.B.'s DNA on the white latex gloves links him to the crime. That pair of gloves was the only one that police found at C.J.'s residence, although C.J. told Investigator Decker that she and her mother kept some "rubber gloves" in the home for cleaning. But J.A.M.'s description of the clothing and physical appearance of the intruder matched that of appellant, including a distinct facial feature— an upturned eyebrow—that she could see under the nylon stocking on his head. And J.A.M. also indicated that the intruder was a "short" man, maybe 5' 4" tall, which is consistent with appellant's height. E.B. is 6' 1" tall. There was only one known intruder at J.A.M.'s home, and appellant's GPS monitor recorded that, despite his claims of having been in Superior, he was at the house at the time of the break-in.

Taken together, the facts relied on by appellant do not have an inherent tendency to link E.B. to the commission of the assault, aggravated-robbery, and burglary offenses. Accordingly, the district court acted within its discretion in denying appellant's request to introduce alternative-perpetrator evidence.

Even if the district court had admitted the alternative-perpetrator evidence, we are convinced that the jury would not have reached a different verdict. *See Sailee*, 792 N.W.2d at 93 ("The error is harmless if the jury's verdict is surely unattributable to the error.") (quotation omitted). The jury heard through testimony that E.B.'s DNA was the only DNA found on the white latex gloves found at C.J.'s home, that E.B. was using J.A.M.'s cell phone when police searched C.J.'s home, and that E.B. had a piece of J.A.M's cut-up driver's license in his possession. The jury therefore knew most of the facts that appellant sought to present to support his alternative-perpetrator defense

regardless of the district court's ruling on the admission of E.B.'s statement that E.B. no longer kicks in doors to complete burglaries.

Even if there was error, which we conclude there was not, it was harmless because "an average jury" would have reached the same verdict if it had considered the additional alternative-perpetrator evidence. *See State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994) (noting that an error is harmless beyond a reasonable doubt where, even with "the damaging potential of the evidence fully realized, an average jury (*i.e.*, a reasonable jury) would have reached the same verdict"). The other evidence against appellant was strong: J.A.M.'s description of the appearance and clothing of the intruder which matched appellant; appellant's GPS-monitor records placed him at J.A.M.'s home at the time of the offenses (when he claimed to have been elsewhere); testimony that appellant left and returned alone the night of the offense; and testimony that appellant told K.M. he had gotten the stolen items by kicking in a door.

The district court acted within its discretion in excluding proffered alternative-perpetrator evidence. And the error, if any there had been, would be harmless.

## II.    Jury Instruction

Appellant also argues that the district court erred in denying his request for a special jury instruction concerning the reliability of eyewitness identification. Jury instructions are entrusted to the district court's discretion, and a district court's refusal to give a requested instruction will not be reversed absent an abuse of discretion. *State v. Cole*, 542 N.W.2d 43, 50 (Minn. 1996). The focus of our analysis is on whether the refusal resulted in error. *State v. Kuhnau*, 622 N.W.2d 552, 555 (Minn. 2001).

10

In *State v. Lindsey*, the Minnesota Supreme Court affirmed the district court's denial of a defendant's request for a one-and-a-half page, single-spaced instruction concerning eyewitness identification. 632 N.W.2d 652, 661-62 (Minn. 2001). In *Lindsey*, the district court denied the request, and instead, it instructed the jury using the pattern jury instruction. *Id.* at 662; *see* 10 *Minnesota Practice*, CRIMJIG 3.19 (1990). The supreme court noted that the district court correctly "equated the proposed instruction to defense counsel's closing argument and noted that it could potentially distract the jury from making findings beyond a reasonable doubt." *Lindsey*, 632 N.W.2d at 662. The supreme court also concluded that the pattern jury instructions "convey[] the relevant aspects of witness identification to the jury." *Id.*

Here, the district court denied appellant's requested four-page, single-spaced instruction concerning the reliability of eyewitness identification. The district court denied the request after explaining that

> the issues with eyewitness identification . . . are addressed through direct and cross-examination. The proposed jury instruction is long. It's five [sic] pages. It's single-spaced. Yes, Counsel has the right and the Court can agree to alter a JIG sometimes to tailor it to a specific case, but this isn't altering it, this is completely rewriting it, and I am neither in a position to create new case law, nor new criminal procedure, nor trial procedure. . . . [T]here's a lot in here, they talk about research, but that's a lot to put before a jury and it's not appropriate.

As in *Lindsey*, the district court here instructed the jury using the pattern jury instruction, which has not changed from the version of which the supreme court approved in *Lindsey*.

11

*Compare* 10 *Minnesota Practice*, CRIMJIG 3.19 (2015), *with* 632 N.W.2d at 662 (quoting 10 *Minnesota Practice*, CRIMJIG 3.19 (1990).

Appellant does not attempt to distinguish *Lindsey* on appeal, but instead only argues that "given the advances in social sciences . . . it was an abuse of discretion to deny the requested jury instruction." Appellant relies on a Massachusetts case to argue that "the science underlying the [pattern] jury instruction . . . has advanced to the point where Minnesota's pattern jury instruction on witness identification is inadequate." The Minnesota Supreme Court, however, has never held that the relevant pattern jury instruction is inadequate or misstates the law. And there is no other Minnesota authority for appellant's proposed instruction. Reversal would require us to change the law, which exceeds our proper role. *See Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn. App. 1987) (explaining that public-policy arguments to modify existing law are within the purview of the Minnesota Supreme Court or the legislature, and not this court), *review denied* (Minn. Dec. 18, 1987).

The jury instruction given by the district court correctly states Minnesota law. The district court acted within its discretion.

**Affirmed.**