STATE of Minnesota, Respondent,

v.

Calvin FERGUSON, Appellant.

No. A10–0499.

Supreme Court of Minnesota.

Oct. 19, 2011.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Sara L. Martin, Assistant State Public Defender, St. Paul, MN, for appellant.

OPINION

ANDERSON, PAUL H., Justice.

Calvin Ferguson was convicted in Hennepin County District Court of first-degree premeditated murder for the death of Irene Burks. The court then sentenced Ferguson to life in prison without any possibility of release. Ferguson has appealed his conviction and raises eight separate issues. On appeal, Ferguson argues that (1) the district court abused its discretion by admitting hearsay evidence that "C.J." or "B.J." (Ferguson's street names) shot Burks; (2) the court abused its discretion by allowing into evidence Ferguson's bad acts testimony from another trial; (3) the State committed prosecutorial misconduct; (4) the court erred by precluding Ferguson from calling an expert witness on eyewitness identification; (5) the court abused its discretion by excluding evidence of an alternative perpetrator; (6) the court erred by limiting Ferguson's impeachment of a witness; (7) the court erred by refusing to instruct the jury on circumstantial evidence; and (8) the cumu-

lative effect of trial errors deprived him of a fair trial. We reverse on the alternative perpetrator issue and remand for a new trial.

Irene Burks was shot to death on September 12, 2006. At approximately 5:30 p.m. on the day she was shot, Burks went to the home of K.C. K.C. and Burks were close friends and routinely saw each other several times a week. After Burks arrived at K.C.'s home, she did not go inside the home but remained outside to speak with K.C. and K.C.'s daughter. Burks asked K.C. if she could use K.C.'s telephone. K.C. went back inside her home to get the telephone. Burks remained outside the home and continued to visit with K.C.'s daughter, who was standing in the doorway of the home. After retrieving the telephone, K.C. returned to the doorway. As she was handing the telephone to Burks, K.C. looked up and saw an African American man wearing a black hooded sweatshirt standing between two trucks parked across the street. As K.C. watched the man, he started running toward K.C.'s home. K.C. became alarmed when she saw a large object in the man's hand, so she yelled out Burks's name. When the man reached K.C.'s gate, he fired a gun at Burks. K.C. reacted by pulling her daughter inside the home and closing the door. K.C. testified that from inside her home, she heard approximately six more gunshots being fired outside. She then called the police. When the police arrived, K.C. opened the door and saw Burks lying in the front yard. K.C. located all of her children and saw that her daughter's ankle was bleeding. The police determined that the daughter had suffered a gunshot wound and treated her injury at the scene. Meanwhile, an ambulance took Burks to the Hennepin County Medical Center, where she died of the injuries she sustained as a result of the shooting.

Several eyewitnesses observed some of the events surrounding the shooting. W.O., A.Q., J.W., and O.M. all lived in the neighborhood. W.O., A.Q., and J.W. reported seeing an individual wearing a dark-colored hooded sweatshirt leaving the scene of the shooting. A.Q. and J.W. stated that they saw the individual running toward a parking space in an alley opposite K.C.'s home. Shortly afterward, they observed a brown sedan back out of the same parking space and hit a garage before the sedan headed south down the alley. O.M. observed an individual get into a brown sedan, back into the garage, and head south down the alley.

When police officers arrived at the scene, they took a statement from K.C. K.C. described the shooter as a "black male, about five-nine, thin build, medium to dark complected." She said his nose was "a little wider," and he had "medium-sized lips." She said the shooter was wearing a blue or black "hoodie." Police officers also examined the forensic evidence found at the scene—footprints, tire tracks, and bullet casings.

*Investigation of Calvin Ferguson*

Sergeant Bruce Folkens led the investigation of Burks's murder. Shortly after the shooting, in late September or early October 2006, Burks's mother telephoned Folkens and told him that she had just heard from her niece that the person who shot Burks was called "B.J." Later, Burks's mother called back to tell Folkens that the shooter's name was actually "C.J."[1] Folkens would later testify that he knew from his time working in the community that the defendant, Calvin Ferguson, had used both of these names.

---

1. Folkens recalled that Burks's mother said "C.J." initially, and "B.J." on the second call.

On the basis of the calls from Burks's mother and his prior knowledge of Ferguson, Folkens retrieved a photograph of Ferguson and prepared a six-person sequential photographic lineup that included Ferguson's photograph. Folkens then met with K.C. at her home and showed her the photo lineup while they both sat at the dining room table. K.C. viewed all six photographs in the photo lineup and identified Calvin Ferguson, who was depicted in the second photograph, as the person who shot Irene Burks. K.C. was the only eyewitness who was able to identify Ferguson from a photo lineup. Folkens showed the same lineup to A.Q. and J.W., but neither of them was able to identify Ferguson as the person he saw at the scene of the shooting. Folkens also prepared a second photo lineup consisting of profile views of the same individuals for J.W., who had told Folkens that he had seen the suspect from the side. J.W. was unable to identify a suspect from the second lineup.

On August 7, 2008, a Hennepin County grand jury indicted Ferguson for first-degree and second-degree murder under Minn.Stat. §§ 609.185, 609.19 (2010) respectively. He was arrested shortly thereafter. At trial, the State elicited testimony in support of the facts set forth above. The State also introduced Ferguson's testimony from *United States v. Edwards*, a case in which Ferguson had testified on behalf of the United States. In this testimony, Ferguson admitted to being part of a group called the Rolling 30s Bloods. He stated that he and other members of the Rolling 30s Bloods had street names, and that his street names were C.J., B.J., and "Bad News." Ferguson testified that gang members use street names to help them get away with crimes. Ferguson stated that he wore a black hooded sweatshirt with the letters "RTB," which was short for the "Rolling 30s Bloods," airbrushed in red ink on the back. He said that these colors, specifically red and black, were the colors that identified the Rolling 30s Bloods, as opposed to blue, which was associated with a different gang.

Ferguson's testimony in *Edwards* also included a statement that he was an "enforcer" for the Rolling 30s Bloods. He described the role of an enforcer as follows: "[I]f we was to have a problem, [the enforcer] would be the person that's most likely going to go take care of it." An enforcer would "make sure it's safe . . . for us to sell drugs." Ferguson went on to testify that he used guns in his capacity as an enforcer, and shared guns with his fellow gang members.

The State introduced additional evidence suggesting that Irene Burks was being followed by someone shortly before she was shot. The State's evidence showed that, at approximately 1:30 p.m. on the day she was shot, Burks went to a neighborhood deli. She left the deli for a while and purchased some food at a nearby restaurant before returning to the deli at around 4:00 p.m. Shortly thereafter, Burks again left the deli. E.W. testified that he was on the porch of a house within viewing distance of the deli on the afternoon of September 12, 2006. He said that he saw Burks at the deli, and also saw a man pacing back and forth nearby. E.W. testified that the man was African American, between five-nine and five-eleven with a medium build, and the man had "medium beady eyes," a broad nose, and "chubby" lips. The man was wearing a black hooded sweatshirt with dark pants. E.W. testified that when Burks left the deli, the man he was watching walked into an alley by the deli, and shortly afterward, a tan Ford Taurus came out of the alley. The car sped up until it caught up with Burks's car, and then it followed her.

Derrick Johnson also testified for the State. Johnson was incarcerated with Ferguson in the Anoka County jail in December 2008, during which time both men were transported together to the Hennepin County courthouse. Johnson testified that he knew Ferguson as B.J. Johnson testified that Ferguson told him that he did not know why he was being transported to the Hennepin County courthouse, but that Ferguson thought his friend L.S., also known as "Killer," was "telling on him" for some incident that Ferguson did not describe. Johnson testified that Ferguson told him—again without referring to a specific incident—"[t]hat it was Killer's weapon. The gun belonged to him." Johnson also testified that Ferguson told him that a fellow gang member called "Izzy" was supposed to shoot Irene Burks, and if "Izzy [had] taken care of it, [Ferguson] wouldn't have had to do it." Johnson's testimony about Izzy was the only motive evidence that the State introduced, and there is no other evidence in the record that indicates why Burks was murdered.

Ferguson's counsel impeached Johnson with his felony convictions for being an accomplice after the fact, fleeing a peace officer in a motor vehicle, third-degree burglary, and being a felon in possession of a firearm. Ferguson's counsel also elicited evidence that Johnson had previously told Folkens that Johnson knew nothing about Ferguson's case and that he had stated, "[Y]ou don't get no assistance from helping the defense at all." Ferguson's counsel also showed that the State agreed to recommend a 12–month reduction in Johnson's sentence for another crime and that L.S., who Johnson said had given Ferguson the gun in question, had been in prison at the time of the homicide.

The Assistant Hennepin County Medical Examiner, who conducted the autopsy of Irene Burks, also testified for the State. The medical examiner testified that Burks was shot from an indeterminate distance and that she died of multiple gunshot wounds, some of which she received when she was lying on the ground. The State also called a forensic scientist who testified that the cartridge casings found at the scene were the type used in a .40 caliber handgun. The forensic scientist testified that he looked for fingerprints on the cartridges but found none. He also testified that the State found tire tracks and paint scrapings at the scene, but the State could not link any of this physical evidence to Ferguson.

The jury found Ferguson guilty of first-degree and second-degree murder. The district court then convicted Ferguson of first-degree murder and sentenced him to life in prison without the possibility of parole. Ferguson filed his notice of direct appeal on March 15, 2010.

I.

We begin our analysis by addressing Ferguson's claim that the district court erred when it excluded the alternative perpetrator evidence. Ferguson argues that the court erred by denying his motion to introduce evidence of an alternative perpetrator, and that this error infringed upon his constitutional right to present a complete defense. Ferguson made a motion to introduce evidence that connected Christopher Jennings, an acquaintance of Burks, to the shooting. The court denied Ferguson's motion. When reviewing constitutional error, we first determine whether the district court erred, and then "whether the error was harmless beyond a reasonable doubt." *State v. Hall*, 764 N.W.2d 837, 841–42 (Minn.2009); *see also id.* at 844 n. 4.

All defendants accused of criminal behavior have the constitutional right

to present a complete defense. *State v. Larson,* 787 N.W.2d 592, 597 (Minn.2010) (citing *State v. Atkinson,* 774 N.W.2d 584, 589 (Minn.2009)). Included within this right is "the right to present evidence showing that an alternative perpetrator committed the crime with which the defendant is charged." *Id.* (internal quotation marks omitted). Such evidence is generally not admitted "for the purpose of establishing the alternative perpetrator's guilt, but to create a reasonable doubt as to the defendant's guilt." *Id.* (internal quotation marks omitted). Courts may limit the defendant's evidence to ensure that the defendant does not confuse or mislead the jury. *State v. Hannon,* 703 N.W.2d 498, 506 (Minn.2005) (citing *Taylor v. Illinois,* 484 U.S. 400, 411 n. 15, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)).

■ Alternative perpetrator evidence is admissible only if the defendant makes a "threshold showing that the evidence the defendant seeks to admit has an 'inherent tendency to connect the alternative perpetrator to the commission of the charged crime.'" *State v. Nissalke,* 801 N.W.2d 82, 99 (Minn.2011) (quoting *State v. Larson,* 788 N.W.2d 25, 36–37 (Minn.2010)). This foundational requirement " 'avoid[s] the use of bare suspicion, and safeguard[s] a third person from indiscriminate use of past differences with the deceased.'" *Id.* (quoting *State v. Jenkins,* 782 N.W.2d 211, 224 (Minn.2010)).

■ Once the defendant lays foundation for the evidence by proving its inherent tendency to connect the alleged alternative perpetrator to the commission of the crime, " 'it is permissible to introduce evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act,' in order to cast a reasonable doubt on the state's case." *State v.*

*Jones,* 678 N.W.2d 1, 16 (Minn.2004) (quoting *State v. Hawkins,* 260 N.W.2d 150, 159 (Minn.1977)). Exclusion of alternative perpetrator evidence "will almost invariably be declared unconstitutional when it significantly undermines fundamental elements of the defendant's defense." *Id.* (internal quotation marks omitted).

Ferguson sought to present the jury with an alternative perpetrator theory in response to the State's identity-of-the-shooter evidence. The State presented evidence that a person identified as either B.J. or C.J. committed the murder. The State also presented evidence that Ferguson was known as B.J. and C.J. The State contended that it was not offering the evidence about the identity of the shooter for the truth of the matter asserted therein but only to explain the basis for the police investigation of Ferguson. The jury was not given any cautionary instruction limiting the manner in which the jury could use the evidence as to the identity of the shooter.

In his defense, Ferguson attempted to admit evidence about an alternative perpetrator, Christopher Jennings. Ferguson offered the following foundational evidence. T.B. called Folkens and told him that someone who went by the name C.J. shot Burks. Jennings's initials are C.J., he was listed as C.J. in Burks's cell phone contacts, he had a tattoo of the letters C.J. on his arm, and three days before the shooting—September 9, 2006—Burks spoke to him on the telephone. Further, Jennings's physical description was in several ways similar to the descriptions of the shooter provided by witnesses. Jennings also drove a car that matched some of the descriptions of the car seen at the scene of the shooting. Finally, Jennings was arrested for possession of a firearm without a permit on April 4, 2006, but was not in police custody on the date of the shooting.

In response to Ferguson's foundational evidence, the State argues that there must be some direct evidence placing the alternative perpetrator at the scene of the crime, plus additional evidence connecting the alternative perpetrator to the crime. The State cites *Atkinson*, in which we noted that evidence of an alternative perpetrator's presence at the scene of the crime is insufficient on its own to create an inherent tendency connecting the alternative perpetrator to the crime. 774 N.W.2d at 590 (citing *State v. Flores*, 595 N.W.2d 860, 868–69 (Minn.1999)). In *Atkinson*, the defendant produced evidence suggesting the alternative perpetrator's presence at the scene of the crime and evidence that the alternative perpetrator had a tattoo similar to the shooter's tattoo. *Id.* at 591. We held that these pieces of evidence did not create an inherent tendency connecting the alternative perpetrator to the crime. *Id.* Acknowledging that it was a "close question," we concluded that the specific evidence suggesting the alternative perpetrator's presence at the scene of the crime connected the alternative perpetrator only to the location of the crime, not the crime itself. *Id.* We then concluded that the remaining evidence, when considered in light of all of the evidence in the record, failed to create an inherent tendency to connect the alternative perpetrator to the crime. *Id.* at 591–92.

The foundational evidence offered by Ferguson surpasses the foundational evidence offered in *Atkinson*. In particular, Jennings's physical appearance matches descriptions of the shooter's physical appearance and Jennings's car matches witnesses' descriptions of the shooter's car. Both pieces of evidence suggest Jennings was present at the scene of the crime. Moreover, Ferguson produced other evidence that connects Jennings to Burks, and to the crime. Thus Ferguson has not only produced evidence placing Jennings at the scene of the crime but has also offered additional evidence connecting Jennings to the victim.

After reviewing Ferguson's offer of proof, we conclude that the alternative perpetrator foundational evidence, with respect to Jennings, was sufficient to allow Ferguson to present an alternative perpetrator defense. Ferguson presented multiple pieces of information that may have incriminated Jennings and so had an "inherent tendency" to connect Jennings to the commission of Burks's murder. *Jones*, 678 N.W.2d at 16. Therefore, we hold that the district court erred when it excluded the evidence after concluding that Ferguson had not laid a proper foundation.

▇▇▇▇ Our conclusion that the district court erred when it excluded the alternative perpetrator evidence does not end our inquiry. To determine whether the erroneous exclusion of the alternative perpetrator evidence infringed on Ferguson's constitutional rights, we must determine whether the court's error was harmless beyond a reasonable doubt. *Hall*, 764 N.W.2d at 842. An error is harmless beyond a reasonable doubt " '[i]f the verdict rendered is surely unattributable to the error.' " *Id.* (quoting *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997)) (internal quotation marks omitted). An error is not harmless if there is "a reasonable possibility that the verdict might have been different" if the error were not committed. *State v. Quick*, 659 N.W.2d 701, 716 (Minn. 2003) (internal quotation marks omitted).

▇▇▇ We conclude that there is a reasonable possibility the jury may have reached a different verdict if the jury had known the information regarding Jennings. We reach this conclusion despite evidence that K.C. testified that she saw the shooter as he ran toward K.C. and Burks, and that K.C. ultimately identified

Ferguson in a photo lineup. Ferguson rebuts K.C.'s eyewitness identification with a lack of any physical evidence connecting Ferguson to the shooting, as well as evidence that no other eyewitness identified Ferguson as the shooter. In light of the absence of physical evidence and other identifications, we conclude the jury might have reached a different result if it had known about (1) the similarities in physical descriptions and characteristics of Ferguson and Jennings, (2) their common nickname, (3) Jennings's listing as C.J. in Burks's phone, (4) the tattoo of C.J. on Jennings's arm, (5) the telephone call between Jennings and Burks three days before the shooting, and (6) the fact that Jennings was not in custody on the day of the shooting despite an arrest for possession of a firearm without a permit.

Because we conclude that the verdict might have been different if the jury had received the alternative perpetrator evidence, we hold that the district court's error was not harmless beyond a reasonable doubt and infringed on Ferguson's constitutional right to present a complete defense. Having held that the district court erred when it excluded the alternative perpetrator evidence, and that the court's error was not harmless beyond a reasonable doubt, we hold that Ferguson is entitled to a new trial.

## II.

Because the district court's exclusion of the alternative perpetrator evidence denied Ferguson his constitutional right to present a complete defense and entitles him to a new trial, we do not need to reach the other issues raised by Ferguson.

Reversed and remanded.

ANDERSON, PAUL H., Justice (concurring).

I agree with the majority of our court that Ferguson is entitled to a new trial based on the erroneous exclusion of the alternative perpetrator evidence. Nevertheless, I write separately because I believe that several other remaining issues raised by Ferguson warrant the court's attention.

## I.

Ferguson argues that the district court erred by admitting testimony that C.J. or B.J. shot Burks. During pretrial proceedings, Ferguson moved to preclude, on hearsay grounds, the admission of any testimony by Irene Burks's mother or Sergeant Folkens that Burks's mother called Folkens to say that she heard that C.J. or B.J. shot Irene Burks. The State opposed the motion, contending that this "information comes in . . . every day in every trial in this courthouse" to give "context" to the police investigation. The court found the statements were not hearsay and admitted this testimony.

In opening statements, the State talked about the expected out-of-court statements, as did defense counsel, who referred to the statements as "rumor." During direct examination of Burks's mother, the State elicited testimony that she called Folkens to tell him that she had heard that the person who shot her daughter was named "B.J." Burks's mother further testified that she heard this information from her niece who, in turn, had received the information from a cousin. Burks's mother also testified that she called Folkens a second time to tell him that the correct name was "C.J." She testified that both names referred to the same person. The State also elicited testimony from Folkens about these telephone calls. Folkens testified that Burks's mother had called and said that "she had heard from the community that a C.J. was responsible for shooting her daughter." Folkens also testified

that Burks's mother called back a second time to say that she "wanted to correct herself and said that it wasn't C.J., it was B.J.[1] [who] had killed her daughter." Folkens went on to testify that his conversations with Burks's mother led him to focus his investigation on Calvin Ferguson, who went by the street names C.J. and B.J.

Ferguson claims that the testimony from Burks's mother and Folkens that C.J. or B.J. shot Burks constitute out-of-court statements that were inadmissible hearsay because they were admitted for the truth of the matter asserted. The State argues that the testimony was not hearsay because the statements were admitted to give the jurors context for the police investigation. We review a district court's evidentiary rulings for an abuse of discretion. *State v. Jenkins,* 782 N.W.2d 211, 229 (Minn.2010) (citing *State v. Vance,* 714 N.W.2d 428, 436 (Minn.2006)). When reviewing for an abuse of discretion, we will not disturb a district court decision unless the court abused its discretion, exercised its discretion in an arbitrary or capricious manner, or based its ruling on an erroneous view of the law. *Dobbins v. State,* 788 N.W.2d 719, 725 (Minn.2010).

We have said that "[h]earsay is evidence of a declarant's out-of-court statement to prove the truth of what is asserted in the statement." *State v. Litzau,* 650 N.W.2d 177, 182–83 (Minn.2002) (quoting *United States v. Reyes,* 18 F.3d 65, 69 (2d Cir. 1994)); *see also* Minn. R. Evid. 801(c). Hearsay evidence is generally not admissible because "it offers the opponent no opportunity to cross examine the declarant on the statement that establishes the declared fact." *Reyes,* 18 F.3d at 69.

Evidence offered for a purpose other than to prove the truth of the matter asserted is not hearsay. For example, "evidence that an arresting or investigating officer received a tip for purposes of explaining why the police conducted surveillance is not hearsay." *Litzau,* 650 N.W.2d at 182. "Tips that inform law enforcement of criminal activity may be offered into evidence for the purpose of explaining actions undertaken pursuant to a criminal investigation; their function, courts reason, is to give context, rather than to prove criminal activity." *United States v. Lovelace,* 123 F.3d 650, 652 (7th Cir.1997); *see also Reyes,* 18 F.3d at 70; *Litzau,* 650 N.W.2d at 182 n. 3. But tips that point to the likelihood of a criminal act raise concerns about how the information in the tip will be used by the jury. As the Seventh Circuit said in *Lovelace:*

> The worry with a tip containing a specific charge of criminality is that it has great potential to be credited by the jury. Such a tip can be particularly prejudicial where it addresses a disputed issue or is made by a knowledgeable declarant (and therefore presumably believed by the jury).

123 F.3d at 653.

The Fifth Circuit has said law enforcement "cannot, through their trial testimony, refer to the substance of statements given to them by nontestifying witnesses in the course of their investigation, when those statements inculpate the defendant." *Taylor v. Cain,* 545 F.3d 327, 335 (5th Cir.2008). In *Litzau* we noted that " '[w]e have said a number of times that a police officer testifying in a criminal case may not, under the guise of explaining how [the] investigation focused on defendant, relate hearsay statements of others.' " 650 N.W.2d at 182 (quoting *State v. Williams,* 525 N.W.2d 538, 544 (Minn.1994)). In an

---

1. As previously noted, Burks's mother and Sergeant Folkens disagree on whether

Burks's mother identified C.J. or B.J. as the shooter in her first telephone call to Folkens.

earlier decision in *State v. Hardy*, we were even more explicit when we said:

> [E]ven a limited elicitation, for nonhearsay purposes, of general testimony that a tip had been received that led to defendant's prints being compared with the [burglar's] latent print would have been unjustified ... because the potential of the evidence being used for an improper purpose outweighed its very limited probative value.

354 N.W.2d 21, 24–25 (Minn.1984).

Thus, regardless of whether investigative background evidence is offered for its truth or for a nonhearsay purpose, the probative value of the evidence must not be substantially outweighed by its danger of unfair prejudice. In Minnesota, the probative value/prejudicial effect balancing test falls under Minn. R. Evid. 403. To satisfy the balancing test, "the non-hearsay purpose by which the evidence is sought to be justified [must be] relevant," *Reyes*, 18 F.3d at 70, and the probative value of the evidence for its nonhearsay purpose must not be " 'substantially outweighed by the danger of unfair prejudice.' " *Litzau*, 650 N.W.2d at 183 (quoting Minn. R. Evid. 403).

Ferguson claims the admission of the B.J. and C.J. hearsay testimony caused him to suffer unfair prejudice that affected his right to a fair trial. In response, the State argues that the district court properly admitted the B.J. and C.J. hearsay testimony to explain the inclusion of Ferguson's picture in the photo lineup shown to the State's key witness. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *see also United States v. Brandon*, 521 F.3d 1019, 1026 (8th Cir.2008) ("Unfair prejudice does not refer to the legitimate probative force of the evidence, but rather its capacity to lure a jury into declaring guilt for an improper reason."); 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:13 (3d ed.2007) (describing unfair prejudice as either emotion based or based on misuse of evidence). We have previously concluded that juries can misunderstand tip evidence as proof specific to the offense charged, instead of understanding the tip evidence as merely giving context to a police investigation. *See Williams*, 525 N.W.2d at 545. This misunderstanding can arise even when the State has cautioned the jury that it should not misconstrue the tip as substantive evidence of the defendant's guilt. *See id.* ("[I]t is unlikely that the jury did not consider the [tip] evidence as substantive evidence of defendant's guilt that corroborated (and was corroborated by) the other evidence presented to establish guilt."). Accordingly, the jury may have misconstrued the B.J. and C.J. hearsay testimony as substantive evidence of Ferguson's guilt despite the fact that the State introduced the evidence to give context to the police investigation.

I am mindful of the State's concern that without some explanation the jury would be left to speculate as to why the investigation focused on Ferguson; but a better approach, as we suggested in *Litzau*, would have been to allow testimony that Folkens acted "on information received," or words to that effect. 650 N.W.2d at 182 n. 3 (citing 2 Charles T. McCormick, *McCormick on Evidence* § 249, at 103–04 (John W. Strong et al. eds., 4th ed.1992)). As admitted, the B.J. and C.J. hearsay testimony presented a risk of unfair prejudice because of the danger that the jury would misuse the testimony for its truth. Moreover, the testimony was of marginal

probative value to establish the context of a police investigation. I would conclude that, under the Minn. R. Evid. 403 balancing test, the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. Thus, the district court should not have admitted the B.J. and C.J. hearsay testimony.

## II.

Ferguson claims that the district court improperly allowed the State to introduce testimony Ferguson gave at a prior federal trial.[2] As part of an agreement on a federal indictment, Ferguson pleaded guilty to conspiracy to distribute crack cocaine and testified for the Government at the court trial of Joe Darrel Edwards in *United States v. Edwards.* The plea agreement required Ferguson's substantial assistance with the government in exchange for a promise by the federal prosecutor to, at the prosecutor's complete discretion, make a motion to reduce the mandatory minimum sentence for Ferguson's conviction.

At a pretrial Omnibus Hearing, the State moved to admit excerpts of Ferguson's testimony from *Edwards.* The State argued that this evidence was admissible because (1) it was relevant under Minn. R. Evid. 401; (2) it was not unduly prejudicial under Minn. R. Evid. 403; and (3) it fell under two hearsay exceptions, the Minn. R. Evid. 801(d)(2)(A) statement of a party-opponent exception, and the Minn. R. Evid. 804(b)(3) statement against interest exception.[3] Ferguson objected to the admission of the testimony arguing that it did not meet the admissibility requirements of Minn. R. Evid. 401, 403, 801, or 804. Additionally, Ferguson argued that his testimony in *Edwards* was inadmissible under Minn. R. Evid. 404(b) because the testimony was offered to prove character in order to show propensity to commit the charged crime and that the Fifth Amendment of the United States Constitution prohibited the use of his prior testimony during the State's case in chief. The Omnibus Hearing court granted the State's motion, relying on *State v. Clark,* 296 N.W.2d 372 (Minn.1980) (*Clark II*),[4] but the court did not address either party's other arguments, including Ferguson's Minn. R. Evid. 404 argument.

At trial the district court reaffirmed the admission of Ferguson's testimony in *Edwards.*[5] The State then had seven excerpts of Ferguson's testimony in *Ed-*

---

2. Defense counsel referred to this testimony as grand jury testimony, but later corrected her mistake. The record indicates that the testimony offered was Ferguson's trial testimony.

3. I note that a statement of a party-opponent under Minn. R. Evid. 801(d)(2)(A) is not a hearsay exception but rather is nonhearsay.

4. The court in *Clark II*, a double homicide case, addressed whether a defendant's testimony given at his earlier trial for the death of one victim was admissible at his trial for the death of the second victim. 296 N.W.2d at 374–75. *Clark II* held that defendant's testimony from his first trial was admissible at his second trial unless defendant was forced to testify at the first trial to refute illegally ob-

tained and admitted confessions. *Id.* at 375 (citing *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968)). But our holding in *Clark II* did not purport to render testimony given at a prior proceeding immune from exclusion under our rules of evidence—rather, it merely held that the Fifth Amendment did not bar admission of testimony from an earlier trial when the testimony was elicited by a legally obtained confession.

5. Under the comment to Minn. R.Crim. P. 11, "when the Omnibus Hearing is held before a judge other than the trial judge, the trial judge, except in extraordinary circumstances will adhere to the findings and determinations of the Omnibus Hearing judge." (Citing *State v. Coe,* 298 N.W.2d 770, 771–72 (Minn.1980).)

*wards* read into the record by the court reporter who had transcribed the testimony. In those excerpts, the federal prosecutor elicited testimony that (1) Ferguson was part of the Rolling 30s Bloods gang; (2) the Rolling 30s Bloods had street names, Ferguson's street name was B.J., and street names made it "easier to get away with like a crime"; (3) gang members had guns and shared guns "all the time" in order "to protect each other"; (4) Ferguson wore jeans, black shoes, and a black hoodie with "RTB" airbrushed on the back to send a message, "like with that warning thing"; (5) he admitted wearing "the hoodie" on the "night of the shooting"; (6) he considered himself an "enforcer," the "person that's most likely to take care of [a problem for the gang]"; and (7) the Bloods send messages in code to people in prison.

Ferguson asserts that the *Edwards* testimony was inadmissible under Minn. R. Evid. 404(b), which forbids the use of other crimes, wrongs, or acts to prove character in order to show "action in conformity therewith." The State argues that Ferguson's testimony was admissible to corroborate the testimony of several of the State's witnesses. The State contends that Ferguson's federal testimony was admissible to corroborate the testimony of Derrick Johnson. Johnson testified that he knew Ferguson by the street name B.J., and that when he and Ferguson were in jail together, Ferguson told him "had Izzy taken care of it, [Ferguson] wouldn't have had to do it." The State also claims the testimony was necessary to corroborate the testimony of Burks's mother and Sergeant Folkens who both testified to the background hearsay regarding C.J. and B.J.

We review a district court's decision to admit evidence under the abuse-of-discretion standard. *State v. Pendleton*, 759 N.W.2d 900, 908 (Minn.2009) (citing *State*

*v. Shannon*, 583 N.W.2d 579, 583 (Minn. 1998)). "A defendant appealing the admission of evidence has the burden to show it was erroneous and prejudicial." *State v. Burrell*, 772 N.W.2d 459, 465 (Minn.2009).

Minnesota Rule of Evidence 404(b) states:

> Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted unless (1) the prosecutor gives notice of its intent to admit the evidence ... (2) the prosecutor clearly indicates what the evidence will be offered to prove ... and (5) the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant.

*Id.* We have said that "[t]his general exclusionary rule is grounded in the defendant's constitutional right to a fair trial." *State v. Ness*, 707 N.W.2d 676, 685 (Minn.2006) (citing *State v. Spreigl*, 272 Minn. 488, 495, 139 N.W.2d 167, 171 (1965)).

The "overarching concern" behind excluding evidence of other crimes, wrong, or acts (also known as *Spreigl* evidence) is that it might "be used for an improper purpose, such as suggesting that the defendant has a propensity to commit the crime or that the defendant is a proper candidate for punishment for his or her past acts." *State v. Fardan*, 773 N.W.2d 303, 315 (Minn.2009) (internal quotation marks omitted). "The risk is that a jury will draw a deadly and decidedly improper three-step inference, from bad act to bad person to guilty person or give way to the emotional impulse to punish because the other act alone shows that punishment is

deserved." 1 Mueller & Kirkpatrick, *supra,* § 4.28, at 746 (discussing risks under similar Fed.R.Evid. 404(b)). We have said that if the admission of other acts evidence is a "close call," the evidence should be excluded. *Ness,* 707 N.W.2d at 685.

Rule 404(b) lists several purposes for which other-acts evidence may be offered. These purposes are not exceptions to the prohibition against using evidence of a person's other acts or character to show action in conformity with character. Rather, they are noncharacter uses for other-acts evidence. The United States Supreme Court has said that "[t]he threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *Huddleston v. United States,* 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). We have said that a court " 'should follow the clear wording of Rule 404(b) and look to the real purpose for which the evidence is offered,' and ensure that the purpose is one of the other permitted [noncharacter/purposes under] the rule's general exclusion of other-acts evidence." *Ness,* 707 N.W.2d at 686 (quoting *State v. Frisinger,* 484 N.W.2d 27, 32 (Minn.1992)). In assessing the probative value, a court "must identify the precise disputed fact to which the *Spreigl* evidence would be relevant." *Id.* (internal quotation marks omitted).

The list in Rule 404(b) of noncharacter purposes for use of other-acts evidence "is not meant to be exclusive." Minn. R. Evid. 404(b) comm. cmt.—1989. Use of other-acts evidence for the purpose of corroboration, however, calls for closer scrutiny. As the District of Columbia Circuit Court observed:

[U]se of 404(b) evidence for corroboration [has] inherent complications. Corroboration, in and of itself, is not a separate purpose belonging in the open class of permissible purposes referred to in Rule 404(b)'s second sentence. If it were, evidence could slide past the rule against improper character evidence. To decide if Rule 404(b) evidence is admissible for corroboration, the court must determine what is being corroborated and how. If similar past acts were corroborative *only* because they showed the defendant's character and the likelihood of "action in conformity therewith," plainly the rule would call for exclusion. On the other hand, evidence might corroborate a witness's testimony by showing plan, purpose, intent, etc. and therefore be admissible under 404(b). The label "corroboration" thus merely invites a closer look at exactly how the evidence may be probative.

*United States v. Bailey,* 319 F.3d 514, 520 (D.C.Cir.2003) (emphasis original); *see also* Mueller & Kirkpatrick, *supra,* § 4.37 at 857 (arguing that if corroboration provided a blanket exception under 404(b), "the exception could devour the rule, for other acts could be proved in essentially any case in which there was some other proof of guilt of the charged offense").

The State relies on *State v. Harris,* 560 N.W.2d 672 (Minn.1997), to justify the admission of Ferguson's federal testimony. In *Harris,* an appeal following a conviction on retrial, the district court admitted evidence of the defendant's abuse of a witness under Rule 404(b) to explain why the witness did not testify truthfully at the defendant's first trial. *Id.* at 677–78. We affirmed the district court's decision to admit this evidence, reasoning that "[t]he abuse testimony demonstrated the degree of control exercised by Harris over [the witness] and provided an explanation for [the witness's] willingness to perjure herself on his behalf at the first trial." *Id.* at 677. Although we called the abuse testimony "rehabilitative evidence," *id.* at 677 n. 2, that

evidence was actually admissible to explain the conduct of the witness. *See* 1 Mueller & Kirkpatrick, *supra*, § 4.37, at 857 (stating that defendant's other acts "may explain the conduct of other people, apparently in reaction. Often the proof shows threatening, violent or abusive behavior, which tends to prove fear on the part of victims or others, and knowing of that fear helps understand behavior that would otherwise be hard to decipher.").

I conclude that *Harris* does not stand for the proposition that the State may introduce other-acts evidence simply because it has some small tendency to bolster the admissible testimony of another witness. I would also conclude that Ferguson's federal testimony was not admissible as corroboration evidence. Therefore, because the State does not argue that the evidence was admissible for any other legitimate purpose, I would conclude that it was improperly admitted.

Furthermore, other-acts evidence must be relevant to the consequential fact or facts which the evidence is offered to prove and must not include the defendant's character or propensity as a "necessary link in the inferential chain." *United States v. Houle*, 237 F.3d 71, 77 (1st Cir.2001) (internal quotation marks omitted); *see also United States v. Commanche*, 577 F.3d 1261, 1267 (10th Cir.2009) (holding that "evidence is admissible under Rule 404(b) only if it is relevant for a permissible purpose and that relevance does not depend on a defendant likely acting in conformity with an alleged character trait"); *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir.1994) ("[W]hen evidence of prior bad acts is offered, the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged."). I conclude that we should have considered whether the excerpts of Ferguson's federal trial testimony that were read to the jury had relevance to the disputed issue of identity without inferences of character and propensity as a "necessary link in the inferential chain."

As previously noted, the State chose seven excerpts from Ferguson's testimony at the federal trial that focused on Ferguson's membership in a gang; his street name, B.J.; the gang's access and use of guns; clothing worn on "that day"; the hooded sweatshirt worn on the "night of a shooting"; role as gang enforcer; and gang's method of sending messages in code. When viewed in the context of the ultimate issue in this case—identity—I conclude that this federal trial testimony had little relevance to Ferguson's identity as the shooter in the charged offense without first drawing an inference as to his general character and propensity.

Here, the State attempts to defend the excerpts dealing with Ferguson's street name as being corroborative of the hearsay evidence that "C.J." or "B.J." shot Burks. But evidence that Ferguson used the name "B.J." "to make it easier to get away with crimes" was only relevant to show that Ferguson was the shooter by inviting the inference that he acted in accordance with his propensity to commit crimes. The State also attempts to defend evidence that Ferguson was an enforcer by asserting that the evidence corroborated Johnson's testimony that Ferguson said he had to "take care of it" because Izzy did not. But as previously noted, Rule 404(b) does not permit corroboration if the corroboration evidence requires an inference that the defendant was acting in accordance with a propensity to commit bad acts. Evidence that Ferguson was an enforcer for a gang only tended to prove that he shot Burks by means of an impermissi-

ble inference that he was acting in accordance with his character as someone who committed violent acts on behalf of his gang. This evidence had no other relevance to Ferguson's identify as the shooter. Moreover, the prejudicial effect of the district court's error in allowing the admission of Ferguson's street name testimony and Ferguson's other federal testimony was compounded when the State in its closing argument asked the jury to use Ferguson's federal testimony concerning access to guns and his status as gang enforcer to draw the propensity inference—that Ferguson was "enforcing" when he murdered Burks.

The United States Supreme Court has said that other-acts evidence is generally prohibited because of its prejudicial effect. More specifically, the Court said:

> The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948) (footnotes omitted). Here, there was considerable danger that Ferguson's federal testimony would weigh too heavily with the jurors and overpersuade them to judge Ferguson based on his general record, thus denying him a fair opportunity to defend himself against the charge of shooting Burks. On the record before us, I would conclude that the excerpts from Ferguson's testimony in *Edwards* had little or no relevance to Ferguson's identity

as the shooter, or to corroborate Johnson's testimony unless the jury inferred that Ferguson acted in conformity with his character as an enforcer for the gang. Thus, the evidence was inadmissible under Rule 404(b). Accordingly, I would hold that the district court erred by allowing admission of Ferguson's federal testimony.

### III.

Ferguson also argues that the State committed two instances of prosecutorial misconduct. First, the State elicited testimony that Sergeant Folkens knew Ferguson from Folkens's work as a narcotics and gang officer. Second, the State misstated facts during closing argument.

*Reference to Ferguson's Prior Police Contacts*

Ferguson argues that the State committed misconduct by eliciting testimony from Folkens that Folkens knew Ferguson from his work in the gang unit and in narcotics. Before trial, Ferguson asked the district court to preclude Folkens from referring to Ferguson's prior contacts with the police when Folkens testified about why he knew that Ferguson went by the names B.J. and C.J. The court indicated that the State could elicit testimony that Folkens "worked in the neighborhood," and that "he [knew] Mr. Ferguson as a member of the community or neighborhood," but that there would be "no reference to other police involvement or arrests or things like that." The court then cautioned the State to instruct Folkens to avoid the subject at trial.

At trial, during direct examination about the calls from Burks's mother relating to C.J. and B.J., Folkens testified that Ferguson went by the street names C.J. and B.J. In response to leading questions by the State, Folkens explained that when he was on patrol in the Third Precinct, he "would get to know" members of the com-

munity, and during that time, he became familiar with Ferguson. Folkens testified about how he selected a photograph of Ferguson and then included the photograph in the lineup shown to the State's key witness.

On cross-examination, defense counsel challenged the use of the photo lineup, eliciting testimony that Folkens selected Ferguson's photograph based on the tip from Burks's mother, and that he had not bothered to use the police database that allowed for the search of nicknames. On redirect examination of Folkens, the State again asked leading questions about the lineup:

> Q. And in your 21 years of experience and from working in the Third Precinct and the description you had, you believed that that person had been identified to you as Calvin Ferguson, isn't that correct?
>
> A. Yeah, with the combination of C.J. and B.J., that meant only one person to me, and that was Calvin Ferguson.
>
> Q. So you didn't need to do an inquiry into [the database] to look at all these monikers.
>
> A. No, that combination only pointed me to one person.
>
> Q. And you drew upon that as your experience as an officer who had worked out in the community in Third Precinct, *who worked in the gang unit, worked in narcotics,* all of those years of experience you had accumulated this information and you knew that that combination of monikers and that physical description matched a potential suspect as Calvin Ferguson.
>
> A. Yes, sir.

(Emphasis added.)

We have held that the State commits misconduct when it introduces otherwise inadmissible testimony under the guise of showing how the police came to know about the defendant. In *State v. Strommen*, we held that admission of testimony elicited from the arresting officer that he knew the defendant from "prior contacts and incidents" constituted plain error. 648 N.W.2d 681, 687–88 (Minn.2002). We noted, "It appears that the purpose in asking the offending questions was to illicit a response suggesting that [the defendant] was a person of bad character who had frequent contacts with the police." *Id.* at 688. We have also held that the State commits prosecutorial misconduct when it violates a district court order. *See State v. Fields,* 730 N.W.2d 777, 782 (Minn.2007).

Here, the State's leading questions compounded the previously identified problem with the investigative hearsay testimony and violated the district court's pretrial order that "there should be no reference to other police involvement . . . or things like that." Moreover, the State's reference to Folkens's work in the gang and narcotics units appears to have been gratuitous and served only to imply that Ferguson was a person of bad character who had contacts with the police through gang and narcotics activities.

We have stated repeatedly that " '[t]he state will not be permitted to deprive a defendant of a fair trial by means of insinuations and innuendos which plant in the minds of the jury a prejudicial belief in the existence of evidence which is otherwise inadmissible.' " *State v. Harris,* 521 N.W.2d 348, 354 (Minn.1994) (quoting *State v. Tahash,* 280 Minn. 155, 157, 158 N.W.2d 504, 506 (1968)). The use of questions calculated to elicit or insinuate inadmissible character evidence is error " 'whether the allusion to prior misconduct is contained in the question which the prosecutor asks or in the answer which the witness gives.' " *Id.* (quoting *Tahash,* 280 Minn. at 157–58, 158 N.W.2d at 506); *see*

*also State v. Ray,* 659 N.W.2d 736, 745 (Minn.2003) (noting that we were "troubled" by the prosecutor's repeated attempts to elicit testimony that had previously been ruled inadmissible).

I would conclude that the questions referencing Folkens's experience with gangs and narcotics were improper because they suggested that Folkens knew Ferguson from this context and thus violated the court's pretrial order regarding testimony of Ferguson's prior police contacts. Moreover, the State's reference to Folkens's 21 years of experience in the neighborhood does not excuse the State's direct violation of the court's order.

*Misstatements of Evidence*

Ferguson also argues that the State committed misconduct by stating:

> [K.C.'s] ability to observe that individual and then ultimately make this identification is corroborated. It's corroborated by [K.C.'s daughter] who says, my mom was standing next to me at the time she saw the defendant. [W.O.], who saw the defendant running across the street after [K.C.] saw him shoot Ms. Burks. [O.M.], who saw the defendant get out of the car.

Ferguson's counsel also objected to these statements. The district court did not rule on the objection, but reminded the jurors to rely on their own recollections of the testimony.

Ferguson argues that the State committed misconduct by arguing that W.O. and O.M. saw Ferguson at the scene. The State's assertion—that W.O. and O.M. corroborated K.C.'s identification of Ferguson as the shooter—constitutes a clear misstatement of the evidence. Neither witness identified Ferguson so the State's suggestion in its closing statement that three eyewitnesses were able to corroborate K.C.'s eyewitness identification of Ferguson is unsupported by the record

and did not constitute a reasonable inference based on the evidence. Therefore, I would conclude that the State made misstatements with respect to the evidence and that these misstatements constituted prosecutorial misconduct.

## IV.

Ferguson also argues that the district court abused its discretion by limiting his ability to impeach Derrick Johnson with (1) testimony by Folkens that Johnson had a reputation for untruthfulness; (2) Johnson's statement that Ferguson denied involvement in the shooting; and (3) evidence that Johnson had a conviction for "accomplice after the fact to first-degree murder." We review evidentiary rulings for an abuse of discretion. *See State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003).

*Johnson's Reputation for Untruthfulness*

The record reflects that during Ferguson's cross-examination of Folkens, the district court conducted an off-the-record bench conference out of the presence of the jury. Later, Ferguson's counsel made a record of the conference, explaining that she had asked the court to allow her to question Folkens about Johnson's reputation for untruthfulness. The State objected to this line of questioning, and the court sustained the objection.

Minnesota Rule of Evidence 608(a) states:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Rule 608(a) allows impeachment of witnesses by evidence of untruthful character. 11 Peter N. Thompson, *Minnesota Practice—Evidence* § 608.01, at 323 (3d ed.2001) (discussing impeachment by evidence of character under Rule 608); *see also* 3 Mueller & Kirkpatrick, *supra*, § 6.29, at 174 (stating that Fed.R.Evid. 608 "governs impeachment of witnesses by proof of untruthful disposition"). Character testimony requires a foundation. For reputation testimony, the character witness "must be acquainted with the people and the 'buzz' or talk in the community." 3 Mueller & Kirkpatrick, *supra*, § 6.30, at 187; *see also* Thompson, *supra*, § 608.01, at 323 (explaining foundation for reputation testimony). The plain language of Rule 608(a) also contemplates that the "target witness" has testified before any evidence of untruthful character evidence is allowed. 3 Mueller & Kirkpatrick, *supra*, § 6.30, at 191–92 ("One party should not be allowed to introduce evidence of the untruthful character of another until the latter has testified as a witness."). Here, the record of the bench conference does not contain the basis for the State's objection, the arguments, or the reasons for the ruling by the court. Therefore, on this record, it is not possible to determine whether a proper foundation for the reputation testimony had been established and thus whether exclusion of the testimony constituted an abuse of discretion. I trust that on remand, the foundation requirement will be applied with the foregoing principles in mind, and the reputation evidence will be admitted if Ferguson can lay a proper foundation with evidence showing that Folkens had sufficient knowledge of Johnson's reputation.

*Johnson's Prior Statement that Ferguson Denied Involvement with the Murder*

Ferguson argues that the district court abused its discretion when it precluded him from asking Johnson about Johnson's statement to Ferguson's investigator that Ferguson had denied involvement in the shooting. During cross-examination, Ferguson's counsel asked Johnson, "Do you remember telling my investigator that [Ferguson] did not know anything about [the murder]?" The State objected, and the court upheld the objection on the ground that Johnson's statements were "self-serving," saying, "Mr. Johnson was asked without, I believe without objection, about his own inconsistent statements, but I guess what were deemed self-serving statements were excluded, and that would include Mr. Johnson's testimony about his statements and the investigator coming in to testify about them as well."

As Ferguson notes, a witness's prior inconsistent statement is not hearsay, and is admissible to impeach a witness's testimony at trial. *See State v. Moua*, 678 N.W.2d 29, 37–38 (Minn.2004); *State v. McDonough*, 631 N.W.2d 373, 388 (Minn. 2001). Ferguson's statement to Johnson, and Johnson's statement to the defense investigator, were both offered to impeach Johnson's statement that Ferguson had confessed to him. The mere fact of being "self-serving" is not, in itself, a reason to exclude impeachment evidence. Neither the district court at trial, nor the State on appeal, has offered any other explanation why Johnson's statement was not admissible to impeach him.

Minnesota Rule of Evidence 402 provides: "All relevant evidence is admissible, except as otherwise provided by the United States Constitution, the State Constitution, statute, by these rules, or by other rules applicable in the courts of this state." *Id.* Evidence impeaching Johnson's testimony was relevant, and its admission was not prohibited by any legal authority. Therefore, I would hold that the district court abused its discretion when it pre-

cluded Ferguson from impeaching Johnson with his prior statement that Ferguson had denied responsibility for the shooting.

## V.

Two remaining issues bear attention given that we are remanding this case for a new trial. These two issues are eyewitness identification and confrontation. I will address each of these issues in turn.

*Eyewitness Identification Expert Testimony*

Ferguson argues that the district court abused its discretion by prohibiting him from calling an expert witness to testify about the unreliability of eyewitness identification. Before trial, Ferguson filed a motion to permit the expert witness's testimony. Ferguson's offer of proof stated that the witness was an expert on the psychology of eyewitness perception, memory, retrieval, and identification, had been qualified as an expert on these issues in many states, and would testify concerning these issues at trial. The court denied the motion.

We review a district court's evidentiary rulings, including the admission of expert testimony, for an abuse of discretion. *State v. Anderson*, 789 N.W.2d 227, 234–35 (Minn.2010) (citing *State v. Peterson*, 764 N.W.2d 816, 821 (Minn.2009)). Expert testimony is governed by Minn. R. Evid. 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Minn. R. Evid. 702. In applying Rule 702, the court must exercise its discretion to determine whether the expert is qualified to provide the testimony, and whether the testimony will be helpful to the trier of fact. *See Anderson*, 789 N.W.2d at 235 (citing Minn. R. Evid 702). We have said that an expert opinion will not assist the trier of fact when:

> [T]he subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within that experience.

*State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980).

Our court has twice considered whether a district court abused its discretion by excluding expert testimony on eyewitness identification evidence. In *Helterbridle*, the defendant was convicted on the basis of two eyewitness identifications, after having been denied the opportunity to present expert testimony on the reliability of these identifications. 301 N.W.2d 545, 546–47. We concluded that the admissibility of expert testimony on eyewitness identifications was within the discretion of the district court, and noted that we were not aware of any reported appellate decisions that held that a court abused its discretion by excluding such evidence. *Id.* at 547. We then held the court did not abuse its discretion by excluding the evidence. *Id.* We again upheld the exclusion of expert testimony on eyewitness identification evidence in *State v. Miles*, 585 N.W.2d 368 (Minn.1998). Rejecting the defendant's argument that the scientific evidence on eyewitness testimony was "counter-intuitive," we relied on our conclusion in *Helterbridle* and on the fact that the testimony of the several eyewitness was not crucial to the defendant's case. *Id.* at 371–72.

We noted in *Helterbridle* that "we do not mean to suggest that we think the broader issue of reliability of eyewitness

identification testimony is unimportant." 301 N.W.2d at 547. We then went on to list several examples of possible safeguards that would help prevent convictions of the innocent based on unreliable eyewitness identifications. We said:

> There is no one answer to the problem, but there are a number of safeguards to prevent convictions of the innocent based on unreliable eyewitness identification. Prosecutors do not have to prosecute if they think the evidence is unreliable. Trial courts may suppress identification testimony if the identification procedures rendered the evidence unreliable. Effective cross-examination and persuasive argument by defense counsel are additional safeguards. Proper instruction of the jury on the factors in evaluating eyewitness identification testimony and on the state's burden of proving identification beyond a reasonable doubt are other safeguards. The requirement of jury unanimity is also a safeguard. Finally, this court has the power to grant relief if it is convinced that the evidence of a convicted defendant's guilt was legally insufficient.

*Id.*

We also noted in *Miles* that the presence of the foregoing safeguards was a factor in our decision to affirm the exclusion of the expert testimony in that case:

> The safeguards listed in *Helterbridle* were present in this trial. Appellant was not prosecuted until the police had more than eyewitness identifications to link him to the crime. The jury members were extensively queried during voir dire about the frailties of eyewitness identification and were instructed by the trial court on factors to take into account when assessing eyewitness testimony. The eyewitnesses were all cross-

examined as to the reliability of their testimony and in closing arguments defense counsel urged the jury to view the identifications of appellant with skepticism. While in some circumstances expert testimony relating to the accuracy of eyewitness identification may in fact be helpful to the jury, we fully agree with the trial court in this case that the jury would not be assisted by its admission.

585 N.W.2d at 372. Our decisions in *Helterbridle* and *Miles* indicate that the presence of safeguards against unreliable eyewitness identifications are a factor in determining whether expert testimony would assist the trier of fact.

With the foregoing background in mind, I now turn to my analysis of Ferguson's claim that the district court erred when it denied his request to permit expert testimony on the question of eyewitness identification. I begin my analysis by noting that the procedure followed by the Minneapolis police was not what we would expect. The Hennepin County protocol for photo lineups, adopted in November 2003, outlines several required procedures. *See* Amy Klobuchar & Hilary Lindell Caligiuri, *Protecting the Innocent/Convicting the Guilty: Hennepin County's Pilot Project in Blind Sequential Eyewitness Identification*, 32 Wm. Mitchell L.Rev. 1, 19–21 (2005). Under these protocols, investigators are instructed to conduct "blind" photo lineups; that is, any officer with knowledge of which photo is of the suspect should be out of the view of the witness during the display. *Id.* at 20.

Folkens acknowledged that Hennepin County photo lineup protocol requires that photo lineups be conducted using a double-blind procedure.[6] He also acknowledged

---

6. This procedure is subject to exceptions if a blind examination is not possible. In this case, the investigating officer's report should indicate why a blind identification is not pos-

that he did not follow Hennepin County photo lineup protocol. Moreover, the State decided to prosecute Ferguson on the basis of the single eyewitness identification that resulted from this less than ideal photo lineup procedure. In contrast to the eyewitness testimony at issue in *Helterbridle* and *Miles*, the testimony of K.C., the single eyewitness who identified Ferguson, was central to the State's case.

But on the other hand, while Ferguson's offer of proof noted several subjects about which he proposed to offer expert testimony, the offer did not include relevant information showing the district court why his expert testimony would have helped the jury evaluate the accuracy of K.C.'s eyewitness identification. Moreover, the State, defense counsel, and the court utilized some of the safeguards we outlined in *Miles*. K.C. testified that she saw the shooter standing across the street facing her and then saw him running toward her as she was standing next to the victim. K.C. also testified that she had the opportunity to see and did identify particular features of the shooter's face. Ferguson's counsel then had the opportunity to vigorously cross-examine Folkens and K.C. on the reliability of K.C.'s eyewitness identification and argued the un-

reliability of the identification in closing arguments. Further, the court instructed the jury on factors that could affect the reliability of eyewitness identification and the State's burden to prove guilt beyond a reasonable doubt.

Ferguson makes an additional argument that we should revisit *Miles* and *Helterbridle* in light of recent developments in social science and caselaw in other jurisdictions. It is a compelling argument. As jurists, we must be aware of studies that indicate that several factors affecting the reliability of eyewitness identifications are not necessarily understood by jurors. *See, e.g.,* Richard S. Schmechel et al., *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence*, 46 Jurimetrics J. 177 (2006). There are also a growing number of appellate decisions in other jurisdictions holding that courts have abused their discretion by excluding eyewitness expert testimony in cases where the eyewitness identification was a particularly important factor in the defendant's conviction.[7] Moreover, courts have also noted circumstances under which the exclusion of expert testimony on eyewitness identification might constitute an abuse of discretion.[8]

sible. Folkens's report does not indicate why the photo lineup was not conducted "blind."

7. *See, e.g., State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983); *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984), *overruled on other grounds by People v. Mendoza*, 23 Cal.4th 896, 98 Cal.Rptr.2d 431, 4 P.3d 265 (2000); *Benn v. United States*, 978 A.2d 1257 (D.C.2009); *Echavarria v. State*, 108 Nev. 734, 839 P.2d 589 (1992); *People v. LeGrand*, 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374 (2007); *State v. Copeland*, 226 S.W.3d 287 (Tenn.2007); *Jordan v. State*, 928 S.W.2d 550 (Tex.Crim.App.1996); *State v. Clopten*, 223 P.3d 1103 (Utah 2009).

8. Several jurisdictions—while declining to hold that a district court abuses its discretion

when excluding expert testimony on eyewitness identification under the circumstances— have suggested that under different circumstances, the exclusion of such expert testimony might constitute error. *See United States v. Jackson*, 50 F.3d 1335, 1340 (5th Cir.1995) (concluding that the decision to admit expert testimony on eyewitness reliability is "squarely within the discretion of the trial judge" (quoting *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir.1986))); *Johnson v. State*, 272 Ga. 254, 526 S.E.2d 549, 552–53 (2000) (holding that "[w]here eyewitness identification is a key element of the state's case and there is no substantial corroboration of that identification by other evidence, trial courts may not exclude expert testimony [regarding eyewitness reliability] without carefully

A recent opinion by the New Jersey Supreme Court provides an illuminating recognition of the limitations of eyewitness identification and the usefulness of eyewitness expert testimony. In *State v. Henderson*—an opinion likely to become an important benchmark on the limitations of eyewitness identification—the New Jersey court undertook a painstaking and comprehensive survey of the current scientific and legal state of eyewitness identification. 208 N.J. 208, 27 A.3d 872 (2011). This survey grew out of a court-mandated hearing on eyewitness identification conducted by a court-appointed Special Master. *Id.* at 877. At the hearing, the Special Master heard testimony by seven experts that ultimately "produced more than 2,000 pages of transcripts along with hundreds of scientific studies." *Id.* The studies presented at the hearing, and ultimately relied upon by the court, are based on serious and verifiable science.[9] *Id.* at 892–94. The Special Master found that, of 64 cognitive psychologists, social psychologists, and other experts surveyed,[10] "[n]inety percent or more" found research on eyewitness identification reliable.[11] *Id.* at 911–12. This consensus marks a dramatic change in the scientific community's understanding of eyewitness identification. As the court explained:

> During the 1970s, when the [United States] Supreme Court decided [the test for introducing eyewitness identification], researchers conducted some experiments on the malleability of human memory. But according to expert testimony, that decade produced only four published articles in psychology literature containing the words "eyewitness" and "identity" in their abstracts. By contrast, the Special Master estimated more than two thousand studies related

weighing whether the evidence would assist the jury"); *State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795, 804 (1986) (holding that, where other "uncontroverted or substantial" evidence connecting the defendant to the crime was present, the district court did not err in excluding eyewitness expert testimony); *State v. Hill*, 463 N.W.2d 674, 677 (S.D.1990) (explaining that expert testimony on the unreliability of eyewitness identification may be admitted if the subject matter of the testimony lies beyond the knowledge and experience of the average layperson and if the expert does not "invade the province of the jury"); *State v. Hollen*, 44 P.3d 794 (Utah 2002) (reasoning that exclusion of expert testimony on reliability of lineup procedure was not an abuse of discretion where expert was allowed to testify about factors affecting reliability of eyewitness identifications); *State v. Cheatam*, 150 Wash.2d 626, 81 P.3d 830, 842 (2003) (holding that the trial court must "carefully consider whether expert testimony on the reliability of eyewitness identification would assist the jury in assessing the reliability of eyewitness testimony").

9. "The research [relied upon by the court] represents the gold standard in terms of the applicability of social science research to law. Experimental methods and findings have been tested and retested, subjected to scientific scrutiny through peer-reviewed journals, evaluated through the lens of meta-analyses, and replicated at times in real-world settings." *Id.* at 916 (internal quotation marks omitted).

10. "Ninety-two percent of the participating experts had published articles or books on eyewitness identification, and many in the group had testified as expert witnesses in almost 1,000 court cases, collectively." *Id.* at 911 (citation omitted).

11. "Ninety percent or more of the experts found research on the following topics reliable: suggestive wording; lineup instruction bias; confidence malleability; mugshot bias; post-event information; child suggestivity; alcohol intoxication; and own-race bias. Seventy to 87% found the following research reliable: weapon focus; the accuracy-confidence relationship; memory decay; exposure times; sequential presentation; showups; description-matched foils; child-witness accuracy; and lineup fairness." *Id.* at 911–12 (citations omitted).

to eyewitness identification have been published in the past thirty years.

*Id.* at 892.

The increase in attention devoted to the science of eyewitness identification has resulted in a better understanding of how human memory works. Understanding how memory works has, in turn, given rise to substantial concerns regarding the ability of eyewitnesses to make accurate identifications from memory. *See id.* at 893–94. Memory "consists of three stages: acquisition—'the perception of the original event'; retention—'the period of time that passes between the event and the eventual recollection of a particular piece of information'; and retrieval—the 'stage during which a person recalls stored information.' " *Id.* at 894 (citing Elizabeth F. Loftus, *Eyewitness Testimony* 21 (2d ed.1996)). At each of those stages, the " 'information ultimately offered as 'memory' can be distorted, contaminated and even falsely imagined.' " *Id.* (quoting the Special Master). I make no attempt here to list all of the factors that can result in distortion, contamination, or false memory. But scientists have iso-

lated many of the factors that can result in a misidentification by an eyewitness. *Id.* at 893–917. Some of those factors "are within the control of the criminal justice system"—called "system variables," [12] and some are not-called "estimator variables." [13] *Id.* at 895. For example, eyewitnesses misidentify more often when the suspect is of a different race than the witness, *id.* at 897, or the suspect "brandished" a weapon, *id.* at 905. Eyewitnesses also misidentify more often when a police officer unconsciously indicates to the witness which person in the lineup is the suspect, *id.* at 887–88, gives the witness feedback that he or she has chosen the suspect from the lineup, *id.* at 897, or fails to tell the witness that the suspect might not be included in the lineup, *id.* at 898–900.

The foregoing factors all work to produce varying but significant rates of misidentifications.[14] Each time a misidentification occurs, there is a strong possibility that a jury will find an innocent person guilty.[15] As Justice William J. Brennan

12. System variables include the following: blind administration, preidentification instructions, lineup construction, avoiding feedback and recording confidence, multiple viewings, simultaneous versus sequential lineups, composites, and show ups. *Id.* at 895–904.

13. Estimator variables include the following: stress, weapon focus, duration, distance and lighting, witness characteristics, characteristics of the perpetrator, memory decay, race bias, private actors, and speed of identification. *Id.* at 903–11.

14. For example, one study found a misidentification rate of 68 percent. *Id.* at 888. Another study found a misidentification rate of 41 percent. *Id.* at 887.

15. The American Psychological Association (APA) recently filed an amicus brief to the United States Supreme Court, explaining, "Research shows that juries tend to 'over

believe' eyewitness testimony." Brief for Amicus Curiae American Psychological Association in support of Petitioner at 3, *Perry v. New Hampshire*, No. 10–8974 (U.S. Aug. 5, 2011). A recent report by the American Judicature Society (AJS) confirms the existence of problems with eyewitness misidentification. *See* Gary L. Wells, Nancy K. Steblay, & Jennifer E. Dysart, *A Test of the Simultaneous vs. Sequential Lineup Methods: An Initial Report of the AJS National Eyewitness Identification Field Studies*, American Judicature Society (2011), http://www.ajs.org/wc/pdfs/EWID—PrintFriendly.pdf. The report summarizes the results of an AJS study that sought to determine which photo lineup method—sequential or simultaneous—is more accurate. *See id.* The study, which was based on more than 850 photo lineups collected from four police departments, found that misidentification occurred in over 30 percent of all photo lineups where the witness attempted an identification, but the sequential photo line-up

said, "[t]here is almost nothing more convincing [to a jury] than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!' " *Id.* at 889 (quoting *Watkins v. Sowders,* 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting) (internal quotation marks omitted)). Without question, a misidentification can be devastating—"[n]ationwide, 'more than seventy-five percent of convictions overturned due to DNA evidence involved eyewitness misidentification.' " *Id.* at 886 (quoting another source). The Supreme Court of New Jersey elaborated:

> Study after study revealed a troubling lack of reliability in eyewitness identifications. From social science research to the review of actual police lineups, from laboratory experiments to DNA exonerations, the record proves that the possibility of mistaken identification is real. Indeed, it is now widely known that *eyewitness misidentification is the leading cause of wrongful convictions across the country.*

*Id.* at 877–78 (emphasis added).

Confronted with the realization that the current legal framework fails to adequately protect defendants against misidentifications, the New Jersey court revamped its treatment of eyewitness identification. The court now allows pretrial hearings for defendants who can show some evidence that suggestiveness occurred during the identification. *Id.* at 919–20, 922–924. At the pretrial hearing, the court will investigate all relevant factors that might "affect reliability in deciding whether an identification is admissible." *Id.* at 919. The court asked New Jersey's Criminal Practice Committee and Committee on the Model Criminal Jury Charges to draft revisions of jury instructions relating to eyewitness identification and the factors that can lead to misidentifications. *Id.* at 925–27. The New Jersey court hopes that the revised jury instructions will help jurors "both understand and evaluate the effects that various factors have on memory," *id.* at 919, noting that jurors "do not intuitively understand all of the relevant scientific findings," *id.* at 911. The court concluded that these revisions were necessary "because eyewitness identifications bear directly on guilt or innocence. At stake is the very integrity of the criminal justice system and the courts' ability to conduct fair trials." *Id.* at 878–79.

Because we are remanding for a new trial on other grounds, our court has not decided whether the district court abused its discretion when it excluded expert eyewitness testimony. Nevertheless, if Ferguson offers eyewitness identification expert testimony on remand, I hope that the district court will carefully consider whether the defects in the photo lineup procedure used here and the recent developments in social science require admission of eyewitness identification expert testimony and/or a cautionary jury instruction. Moreover, the court should look closely at New Jersey's safeguards and determine if those safeguards are appropriate here. Specifically, the court should consider the reliability of the eyewitness identification in light of the recent New Jersey Supreme Court decision, in addition to the factors our court has set out in *Miles* and *Helterbridle.* If the expert eyewitness testimony is not "otherwise appropriate," the court should consider alternative approaches to educating jurors on the variables that "can lead to misidentifications." *Id.* at 925, 928. As our courts and jurors grow to under-

procedure produced more than one-third fewer known-innocent ("filler") identifications than did the simultaneous procedure, with no difference in the number of correct suspect picks. *Id.* at 13.

stand the science of eyewitness identification, we can better meet the " 'twofold aim ... that guilt shall not escape or innocence suffer.' " *Id.* at 928 (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

*Confrontation*

Given our court's decision to reverse and remand for a new trial, I conclude it is important to note that the admission of the statement of Burks's niece presents a potential confrontation problem. Although Ferguson does not make this argument, I nevertheless address this issue to provide guidance to the district court on remand, and to highlight my concerns about the admission of this testimony.

The Sixth Amendment to the United States Constitution provides a defendant with the right to be confronted with the witnesses against him. *See also* Minn. Const. art. I, § 6. The Supreme Court has held that under the Sixth Amendment, a testimonial hearsay statement of a witness who does not testify at trial may not be offered against a criminal defendant unless the declarant is unavailable and the opponent has had a prior opportunity to cross-examine the declarant. *Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("Where testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."); *see also State v. Scacchetti,* 711 N.W.2d 508, 513 (Minn.2006). The Court also explained that the admission of testimonial statements does not violate the Confrontation Clause if the statements are not offered to prove the truth of the matter asserted. *See Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354. But some federal courts have concluded that "[a]llowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination ... would eviscerate the constitutional right to confront and cross-examine one's accusers." *United States v. Silva,* 380 F.3d 1018, 1020 (7th Cir.2004); *see also Taylor,* 545 F.3d at 335. On remand, I trust that during Ferguson's new trial, the district court will carefully consider whether the admission of out-of-court statements by Burke's niece that C.J. or B.J. shot Burks violates Ferguson's confrontation rights under the United States Constitution.